GLOW INDUSTRIES, INC., Plaintiff,

v.

Jennifer LOPEZ, Coty, Inc., a corporation, Sweetface Fashion Company, LLC, Jennifer Lopez Enterprises, inclusive, Defendants.

No. CV 02–06167 MMM PJW.

United States District Court, C.D. California.

July 23, 2003.

**1097**

Kenneth I. Sidle, Corey J. Spivey, Gipson Hoffman & Pancione, Los Angeles, CA, Arthur Aaronson, Aaronson & Aaronson, Encino, CA, Katherine Hendricks, O Yale, Jr., Stacia Lay, Hendricks & Lewis, Seattle, WA, for Plaintiff.

John E. Porter, Eve M. Coddon, Paul Hastings Janofsky & Walker, Joseph M. Gabriel, Glen Allen Rothstein, Liner Yankelevitz Sunshine & Regenstreif, Los Angeles, CA, Lisa Ann Pearson, James D. Weinberger, Fross Zelnick Lehrman & Zissu, Robert L. Sherman, Paul Hastings Janofsky & Walker, New York City, Laura A. Wytsma, Jenifer M. Placzek, Sonnencshein Nath & Rosenthal, Los Angeles, CA, Mark S. Lafayette, Romy Corliss, Gursky & Ederer, New York City, for Defendants.

---

## ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

MORROW, District Judge.

Plaintiff Glow Industries, Inc. ("Glow") filed this action on August 7, 2002, alleging that the use by defendants Jennifer Lopez and Coty, Inc. of the mark GLOW BY J.Lo in marketing perfume and other beauty products constituted trademark infringement and unfair competition. Glow Industries alleges that it has marketed and sold beauty products under the mark GLOW since 1999, and that it has filed an application to secure federal registration of the mark. Defendants answered the complaint on October 8, 2002; simultaneously, defendant Lopez asserted counterclaims for trademark infringement and unfair competition based on her recent acquisition of the mark GLOW KIT. Plaintiff has now moved for summary judgment on Lopez's counterclaims, asserting that the assignment of the GLOW KIT mark to Lopez is invalid, and that there is no evidence of a likelihood of confusion between the GLOW and GLOW KIT marks.

## I. FACTUAL BACKGROUND

### A. The GLOW Mark

Terry Williamson founded Glow Industries, Inc. in 1999, to design, produce, market and sell a brand-intensive line of fragrance, bath and body care products under the trademark GLOW.[1] Glow Industries' application to register the GLOW trademark represents that the mark was first used in commerce on February 28, 1999. It identifies the goods on which the mark is used as skin soaps, bubble bath, skin lotions, skin moisturizers (International Class 3), and candles (International Class 4).[2] It

---

1. Plaintiff's Statement of Uncontroverted Facts and Conclusions of Law ("Pl.'s Facts"), ¶ 1; Lopez's Statement of Disputed Facts and Conclusions of Law ("Def.'s Issues"), ¶ 1.

2. Pl.'s Facts, ¶ 2; Def.'s Issues, ¶ 2.

does not identify fragrance as a product on which the mark is used or anticipated to be used,[3] and Glow Industries' first sale of its "GLOW Scent" perfume did not occur until December 2001.[4]

Glow Industries chose the mark GLOW because of the positive feeling the word evokes, rather than to describe a characteristic of its products or the results that could be obtained from using the products.[5] President Terry Williamson conceptualized GLOW as "a highly branded product line, [and paid] careful attention ... to creating uniqueness and consistency [in] all aspects of its development."[6] Glow Industries product catalog and its glowspot.com website state that the company is "committed to developing and offering ... the finest products to use in your bath and on your skin" because the people "at GLOW are avid users of bath and body products and are obsessive about the sanctity of the bathing ritual."[7] Glow Industries also claims that its products offer users certain health benefits. For example, GLOW Oil has antioxidant properties that help to "repel free radicals," while GLOW Mist is a hydrosol that reputedly has skin care benefits.[8] Williamson testified at her deposi-

tion that some of Glow Industries' moisturizers, bath treatments and facial masks also contain ingredients that help to promote healthier skin.[9]

Glow Industries launched the GLOW product line nationally in April 2000 at the Paramount Hotel in New York City. Approximately forty members of the national press were present. It then launched the line to wholesalers on the national beauty website "gloss.com" in spring 2000, and at Bergdorf Goodman in New York City in fall 2000.[10] Since that time, Glow Industries has developed thirty-six wholesale clients across the country. These include a number of specialty stores, four Nordstrom stores, and the national website "whoisthefairest.com."[11] Williamson concedes, however, that certain of these wholesale accounts have stopped carrying GLOW products.[12] Specifically, Glow Industries stopped shipping to Bergdorf Goodman in 2001. Williamson states that Glow Industries terminated its relationship with Bergdorf because its "accounts payable didn't pay as agreed."[13] Glow Industries' catalog identifies only twenty-one stores that carry GLOW products, in addition to the websites "glowspot.com" and "whois-

---

**3.** Def.'s Issues, ¶ 2; Declaration of O.Yale Lewis in Support of Motion for Summary Judgment ("Lewis Decl."), ¶ 4, Ex. 1 ("Glow Trademark Application") at 2.

**4.** Def.'s Issues, ¶ 1; Declaration of Robert L. Sherman in Support of Opposition to Motion for Summary Judgment ("Sherman Decl."), Ex. 9 (Glow Industries, Inc.'s Answer to Lopez's Third Set of Interrogatories ("Glow Interrogatories")), at No. 32.

**5.** Pl.'s Facts, ¶ 1; Def.'s Issues, ¶ 1.

**6.** Pl.'s Facts, ¶ 49; Declaration of Terry Williamson in Support of Motion for Summary Judgment ("Williamson Decl."), ¶ 8.

**7.** Pl.'s Facts, ¶ 49; Williamson Decl., Exs. 4 (Glow Catalog) at 34, 5 (Glowspot.com Website) at 51.

**8.** Def.'s Issues, ¶ 49; Sherman Decl., Ex. 1 (Deposition of Terry Williamson, May 20, 2003 ("Williamson 5–20 Depo.")) at 26:19–27:1, 32:20–33:4.

**9.** Def.'s Issues, ¶ 49; Williamson 5–20 Depo. at 33:5–25.

**10.** Pl.'s Facts, ¶ 3; Def.'s Issues, ¶ 3.

**11.** Pl.'s Facts, ¶ 10; Williamson Decl., ¶ 26, Ex. 20 (Wholesale Accounts—How clients obtained).

**12.** Sherman Decl., Ex. 2 (Deposition of Terry Williamson, May 21, 2003("Williamson 5–21 Depo.")) at 97:18–21.

**13.** Declaration of Stacia N. Lay in Support of Plaintiff's Reply in Support of Motion for Summary Judgment ("Lay Decl."), Ex. 6 ("Williamson 5/20 Depo.") at 102:3–11.

thefairest.com." [14] GLOW products have been sold in all fifty states through department stores, specialty boutiques, mail order and the internet.[15] Williams asserts that GLOW products have been physically displayed and are available for sale in twenty-nine retail establishments in twenty states.[16] Additionally, Nordstrom purportedly approached Glow Industries about a "national roll-out" of GLOW products that was ultimately to include eighty-eight Nordstrom stores across the country.[17] This roll-out did not occur, and Nordstrom offered no explanation for its failure to proceed.[18] Glow Industries has had nearly 100 wholesale inquiries from entities throughout the United States, as well as several foreign inquiries, which it has declined.[19]

Glow Industries began selling GLOW products in the Chicago area via mail order in the summer of 1999, and has sold its product line in area stores since May 2001.[20] Between May 2001 and October 2002, Glow Industries sold approximately $23,903 of GLOW products to wholesale clients in Illinois. The retail value of these goods was $47,806.[21] While Williams has no direct information that the goods were sold, or that they were sold at retail value,[22] she does not believe her wholesale client Soapstone discounts any merchandise, and she infers that GLOW products were sold because Soapstone reordered.[23] Williams has prepared a chart estimating that retail sales of GLOW products in Illinois between June 1999 and October 2002 may have totaled as much as $55,345.[24] Lopez disputes the use of this estimate, as it calculates Glow Industries' wholesale sales at retail value. Lopez argues that the Glow Industries' actual wholesale sales of $23,903, coupled with its Glow Industries' retail sales of $7,539, should be considered the total of the business it did in Illinois during the relevant period.[25]

Glow Industries' business plan focuses on grass-roots marketing and brand cohesiveness. For this reason, it has done no paid advertising for GLOW products.[26] The company has had opportunities to promote GLOW products, however. Soap Opera Digest purchased a number of GLOW gift pails for soap opera actors who participated in cover shoots for the magazine, and as a result, representatives of "The Young

---

**14.** Williamson Decl., ¶ 8, Ex. 4 (Glow Catalog) at 49.

**15.** Pl.'s Facts, ¶ 12; Def.'s Issues, ¶ 12. Lopez asserts that Glow Industries has adduced evidence of only a single sale of GLOW products in each state. (Def.'s Issues, ¶ 12). Lopez has not, however, proffered admissible evidence to this effect. Moreover, plaintiff's counsel represents that Glow Industries has produced all of its sales invoices, filling two boxes, which demonstrate that its purchasers are scattered throughout the country in all fifty states. (Lay Decl., ¶ 12).

**16.** Pl.'s Facts, ¶ 12; Williamson Decl., ¶ 30.

**17.** Pl.'s Facts, ¶ 13; Williamson Decl., ¶ 26.

**18.** Def.'s Issues, ¶ 13; Williamson 5–20 Depo. at 100:8–25.

**19.** Pl.'s Facts, ¶ 11; Def.'s Issues, ¶ 11; Williamson Decl., ¶ 27, Ex. 21 (Wholesale Inquiries Declined, 2000–Present).

**20.** Pl.'s Facts, ¶ 14; Def.'s Issues, ¶ 14.

**21.** Pl.'s Facts, ¶ 15; Williamson Decl., ¶ 33, Ex. 26 (Wholesale and Retail Sales in Illinois).

**22.** Def.'s Issues, ¶ 15.

**23.** Williamson 5–21 Depo. at 123:5–124:12.

**24.** Pl.'s Facts, ¶ 15; Williamson Decl., ¶ 33, Ex. 27 (Retail Sales—Data from Illinois). Williamson notes that she is unable to calculate the exact amount because of computer data losses. (Williamson Decl., ¶ 33).

**25.** Def.'s Issues, ¶ 15.

**26.** Pl.'s Facts, ¶ 9; Def.'s Issues, ¶ 9.

and the Restless" soap opera requested permission to use the mark in the name of a fictional beauty company on the show, "Glow by Jabot." [27] GLOW products were also featured on the Showtime cable network program "Soulfood," which in turn led to GLOW products being featured on the website <www.asseenin.com>. This website features products that have been seen on popular television programs.[28] Glow Industries was featured in the closing credits of the film "Pearl Harbor" because producers purchased a number of GLOW products for the cast and crew. GLOW products were included in a care package delivered by actress Reese Witherspoon in a scene in the film "Legally Blonde." [29]

An E! Entertainment representative contacted Glow Industries in September 2001 about a new show on beauty and fashion, hosted by Lopez's sister Lynda Lopez, and sought permission to use the name "Glow" on the show. Glow Industries acceded, based on representations that the show would be product-focused and would air only in Los Angeles and New York. GLOW products were slated to be featured on one episode of the show.[30] NASCAR purchased GLOW "male pails" for their top ten drivers in connection with an awards ceremony held at the Four Seasons in New York in 2000.[31] It was asked twice to include GLOW products in gift baskets given to Oscar presenters, and to provide GLOW products for MTV Movie Awards, Grammys, and Latin Grammys gift baskets.[32] It did not do so, as it "do[es] not contribute products to organizations that aren't charitable in nature." [33]

Glow Industries participates in a "Bath Butler" available at Ritz–Carlton hotels, where customers "can order a specific bath experience just like you might order off of a room service menu, and a person will come up to your room, draw the bath for you, put different products in the bath for you, [and] depending on which bath experience you elected, bring you food and beverage that accompanies that experience as well as in many cases a candle and body lotion." [34] Glow Industries worked with Ritz–Carlton to develop "bath experiences" featuring GLOW products for more than one Ritz–Carlton property, including those in

**27.** Pl.'s Facts, ¶ 4; Williamson Decl., ¶¶ 13–14, Exs. 10 (Record of Soap Opera Digest Gift Pails), 11 ("Glow by Jabot" Webpage).

**28.** Williamson Decl., ¶ 15, Ex. 12 (Acceptance Agreement for Exhibition of GLOW Products on Asseenin.com).

**29.** Williamson Decl., ¶ 16.

**30.** Williamson Decl., ¶ 17, Ex. 13 (Invoice of GLOW Products to be Featured on "Glow" Television Program).

**31.** Williamson Decl., ¶ 19.

**32.** Williamson Decl., ¶ 20, Ex. 15 (Email from PR firm relating to Gift Basket Offers).

**33.** Def.'s Issues, ¶ 4; Williamson 5–20 Depo. at 134:24–135:18. Williamson asserts that entertainment professionals frequently purchase GLOW products for their clients. She proffers invoices purporting to demonstrate that Lopez's management company purchased GLOW products in 1999 and 2000, and that "another prominent entertainment company" ordered GLOW products to be delivered to Lopez in March 2001. Plaintiff has redacted the names of the purchasers on these invoices. (Pl.'s Facts, ¶ 8; Williamson Decl., ¶ 12, Exs. 8 (Redacted Invoices, purportedly from Handprint Entertainment), 9 (Redacted Invoices, purportedly from "another prominent entertainment company")). Lopez objects to the admission of the evidence on the basis that Magistrate Judge Walsh orally ruled that plaintiff may only rely on the evidence of its customer base if it discloses the names of its customers. (Def.'s Issues, ¶ 8). Plaintiff responds that it produced unredacted invoices in compliance with Judge Walsh's rulings, and notes that it is willing to produce these invoices for *in camera* review if requested. (Lay Decl., ¶ 10).

**34.** Williamson 5–20 Depo. at 138:17–139:3.

Cleveland, Ohio and Marina del Rey.[35] Williams asserts that Glow products are also sold in Ritz–Carlton gift shops, although she has only seen them available in the Marina del Rey hotel.[36] Glow Industries did not establish any guidelines for Ritz–Carlton's use of the Glow mark, except to specify that it be used in connection with the Bath Butler program or the sale of Glow products.[37]

Between February and late summer 2002, Glow Industries participated in a co-branding venture with Reebok. Reebok issued a "maglog," i.e., a catalog with editorial content, which featured both an interview with Williamson and her then-business partner, and "product shots" of several Glow products.[38] As part of the venture, certain Glow products were offered for sale on Reebok's website, and a large pail of Glow products was given to a sweepstakes winner. Reebok also purchased "Glow Sticks" to be given to customers who made purchases above a certain dollar amount.[39] Williamson agreed to repurchase any unsold and resalable products from Reebok at the end of the venture, and recalls repurchasing "a very small amount." [40]

Glow Industries also participated in a one-time promotional venture with Mattel in February 2003, developing a "Barbie spa kit" to be given to Barbie licensees at the Golden Barbie Awards in New York City. The company worked with Mattel to determine what products to include in the kits, and offered input on design of the labels. Between 350 and 400 Barbi spa kits were distributed as a result of this venture.[41]

Glow products have been editorially featured in a number of regional, national and international publications, including Vanity Fair, Seventeen, Redbook, Marie Claire, Mademoiselle, Jane, InStyle, W, Harper's Bazaar, Entertainment Weekly, the Los Angeles Times Magazine and the New York Times Magazine.[42] They have also been discussed by individual customers on the national beauty websites <www.makeupalley.com> and <www.whosthefairest.com>.[43]

### B. The Glow Kit Mark

Prior to October 2002, Dr. Giulio Leone, a dermatologist practicing in the Chicago area, owned the registered trademark Glow Kit.[44] Dr. Leone used the mark on a collection of anti-aging skin treatment products that he sold from the offices of his dermatology practice and on his website, <www.leonederm.com>.[45] The Glow Kit trademark registration covers "[c]osmetics sold separately and as a kit, namely alpha hydroxy acid creams, facial cleansing lotions, and skin creams containing vitamin A derivatives." [46] Dr. Leone's trademark application stated he used the mark on his website to promote cosmetic and anti-aging skin products.[47] He disclaimed the

---

35. Williamson 5–20 Depo. at 139:4–148:18.

36. Williamson 5–20 Depo. at 140:11–18

37. Williamson 5–20 Depo. at 148:14–18.

38. Williamson 5–20 Depo. at 152:24–154:3, 154:10–158:8.

39. Williamson 5–20 Depo. at 154:20–155:20.

40. Williamson 5–20 Depo. at 158:4–8.

41. Williamson 5–20 Depo. at 135:21–137:13.

42. Williamson Decl., ¶ 10, Ex. 7 (Various Magazine Articles Featuring Glow Products).

43. Williamson Decl., ¶ 28, Ex. 22 (Web Message Board Postings).

44. Pl.'s Facts, ¶ 24; Def.'s Issues, ¶ 24.

45. Pl.'s Facts, ¶ 25; Def.'s Issues, ¶ 25.

46. Pl.'s Facts, ¶ 33; Def.'s Issues, ¶ 33.

47. Pl.'s Facts, ¶ 34; Def.'s Issues, ¶ 34.

exclusive right to use "kit" apart from the mark as registered,[48] and listed the date of the mark's first use in commerce as October 20, 1998. The GLOW KIT mark was registered on the Principal Register on October 19, 1999 under Registration Number 2,288,023.[49]

Dr. Leone offers three GLOW KITS for sale: GLOW KIT for Sensitive Skin; GLOW KIT for Non–Sensitive Skin; and GLOW KIT for Enhanced Non–Sensitive Skin.[50] The GLOW KIT for Non–Sensitive Skin is packaged in a plain, white paper shopping bag that has a sticker on the front with the words "Leone Dermatology Center" and "GLOW KIT for Non–Sensitive Skin." Three separately-packaged products are inside the shopping bag: TxSystems Afirm 3x, NeoStrata Daytime Skin Smoothing Cream and Leone Dermatology Center's Non–Drying Gentle Cleansing Lotion. Dr. Leone also sells each of these items separately; he does not use the GLOW KIT mark in connection with these sales.[51] Leone's attorney stated that "[t]he products sold as part of the GLOW KIT do not carry the mark; rather they are packaged in a small shopping bag which has a label affixed to the outside which bears the mark 'GLOW KIT.' "[52]

The NeoStrata Company, which manufactures the Neostrata smoothing cream included in the GLOW KIT, "is a dermatological company dedicated to the advancement of skin care and treatment and to educating the public about the benefits of [Alpha Hydroxyacids (AHA)]." Neostrata "manufactures a comprehensive line of advanced, quality AHA skin care products sold exclusively to dermatologists and plastic surgeons under the NeoStrata brand."[53] Bioglan Pharmaceuticals, which manufactures the TxSystems Afirm products included in the GLOW KIT, has a "primary therapeutic focus ... [on] dermatology, with a product portfolio predominantly in prescription pharmaceuticals."[54] Dr. Leone described the NeoStrata and Afirm products as "cosmeceuticals," i.e., "something that's almost like a medication but it's to make people look better."[55] They are "over the counter" products for which no prescription is necessary.[56]

In promotional materials and sales records, Dr. Leone references the kits interchangeably as GLOW KITS and the "NeoStrata GLOW KIT ® for Sensitive [or Non–Sensitive] Skin."[57] He represents that "[m]ost patients are extremely pleased with the changes in their skin with the [GLOW KIT] routines. Typically, your face will look much fresher and have a subtle 'glow' to it." Dr. Leone advertises that use of the GLOW KITS will make a patient's

---

48. Pl.'s Facts, ¶ 35; Def.'s Issues, ¶ 35.

49. Pl.'s Facts, ¶¶ 33, 36; Def.'s Issues, ¶¶ 33, 36.

50. Pl.'s Facts, ¶ 26; Def.'s Issues, ¶ 26.

51. Pl.'s Facts, ¶ 27; Def.'s Issues, ¶ 27.

52. Pl.'s Facts, ¶ 48; Def.'s Issues, ¶ 48.

53. Pl.'s Facts, ¶ 46; Def.'s Issues, ¶ 46. Lopez objects that these facts are irrelevant. The nature of the products sold is relevant in considering the product similarity and marketing channels factors of the *Sleekcraft* test for likelihood of confusion. The objection is accordingly overruled.

54. Pl.'s Facts, ¶ 47; Def.'s Issues, ¶ 47. Lopez objects that these facts are irrelevant. The nature of the products sold is relevant in considering the product similarity and marketing channels factors of the *Sleekcraft* test for likelihood of confusion. The objection is accordingly overruled.

55. Def.'s Issues, ¶ 28; Sherman Decl., Ex. 7 (Deposition of Giulio Leone ("Leone Depo")), at 14:19–15:11.

56. Leone Depo. at 15:14–22.

57. Pl.'s Facts, ¶ 29; Def.'s Issues, ¶ 29.

skin look "younger, softer, smoother, and glowing." [58] In response to a request that she admit the GLOW KIT mark is descriptive, Lopez responded that "the term GLOW describes a desirable characteristic to be achieved through the use of the products and that KIT describes the collection of products offered under the mark, and otherwise deny that the unified mark GLOW KIT is descriptive ..." [59]

Dr. Leone's sales records identify both the "patient" and "diagnosis" related to each sale. In an affidavit he prepared in connection with his sale of the mark, Leone grouped the invoices by doctor within the dermatological practice. [60] The records reflect that from November 2000 to September 2002, Dr. Leone's GLOW KIT sales totaled less than $ 11,000. This equaled less than 170 units. [61] Glow Industries has never received notice that anyone has actually confused the GLOW and GLOW KIT marks, and Lopez has adduced no evidence of such confusion in response to this motion. [62]

## C. The GLOW BY J.LO Mark

Effective April 26, 2001, defendant Jennifer Lopez entered into a license agreement with defendant Sweetface Fashion Co., LLC ("Sweetface") pursuant to which she granted Sweetface the right to use the marks JENNIFER LOPEZ and J.LO BY JENNIFER LOPEZ on "fragrances, cosmetics, and hair care (including all bath and soap related products)." [63] Lopez concedes that the license now extends to other products as well. [64]

In December 2001, Lopez, Sweetface and representatives of defendant Coty met in Frankfurt, Germany, to discuss a fragrance line to be marketed under Lopez's name. Lopez's then manager, Benny Medina, was also present. At the conclusion of the meeting, it was decided that the product name should include the word "glow." [65] On February 7, 2002, Sweetface sublicensed the GLOW BY J.LO mark to Coty for use on fragrances, bath and body products, and "ancillary products." [66] Despite the agreements reached at the December 2001 meeting, it appears that, as of late February, there was some uncertainty whether GLOW BY J.LO would be the name of the product line. The name was finally confirmed on February 24, 2002, [67] and Lopez filed an intent-to-use ("ITU") trademark application for GLOW BY J.LO on February 25, 2002. The application stated that Lopez intended to use the mark on fragrances, cosmetics, and skin care products (International Class 3). [68] On March 7, 2002, Lopez formally approved Sweetface's sublicense with Coty. [69] On March 11, 2002, her representatives received a

58. Pl.'s Facts, ¶ 30; Def.'s Issues, ¶ 30.

59. Pl.'s Facts, ¶ 46; Def.'s Issues, ¶ 46.

60. Pl.'s Facts, ¶ 31; Def.'s Issues, ¶ 31; Lewis Decl., ¶¶ 14, 29, Exs. 11 (Affidavit of Giulio A. Leone), 26 (Lopez's Responses to plaintiff's First and Second Requests for Admission ("Lopez RFA")), at No. 69.

61. Pl.'s Facts, ¶ 32; Def.'s Issues, ¶ 32.

62. Pl.'s Facts, ¶ 50; Def.'s Issues, ¶ 50.

63. Pl.'s Facts, ¶ 16; Def.'s Issues, ¶ 16; Lewis Decl., ¶ 5, Ex. 2 ("Lopez/Sweetface License Agreement"); Lopez RFA, Nos. 47, 49.

64. Def.'s Issues, ¶ 16; Lopez RFA, No. 49.

65. Pl.'s Facts, ¶ 18; Def.'s Issues, ¶ 18.

66. Pl.'s Facts, ¶ 17; Def.'s Issues, ¶ 17; Lewis Decl., ¶ 5, Ex. 2 ("Sweetface/Coty Sublicense Agreement").

67. Def.'s Issues, ¶ 18; Sherman Decl., Ex. 12 (Various Emails Regarding GLOW BY J.LO Name).

68. Pl.'s Facts, ¶ 20; Def.'s Issues, ¶ 20.

69. Pl.'s Facts, ¶ 21; Def.'s Issues, ¶ 21.

Thompson & Thompson Trademark Research Report regarding the proposed mark GLOW BY J.LO. The report identified nineteen similar marks in International Class 3 that were registered, published or pending, and three that were abandoned or expired. Both Glow Industries' pending GLOW application and Dr. Leone's GLOW KIT registration were identified in the report.[70]

In the first month in which GLOW BY J.LO products were available for sale, defendants had sales of approximately $17.9 million in the United States.[71]

### D. Lopez's Acquisition Of The GLOW KIT Mark

Glow Industries commenced this action on August 7, 2002, alleging claims for federal and state trademark infringement and unfair competition based on defendants' use of the GLOW BY J.LO mark.[72] At the time Glow Industries filed its complaint, Dr. Leone owned the registered GLOW KIT trademark.[73] On August 14, 2002, Lopez's representatives contacted Dr. Leone. They stated that they were "trademark lawyers representing a client who is interested in acquiring marks for possible use in the cosmetic and fragrance industries."[74] Lopez's representatives told Dr. Leone's representatives that it had "recently come to [their] client's attention that [Dr. Leone was] the owner of a trademark registration for the mark 'GLOW KIT' in class 3." They said their client was

interested in acquiring rights to the mark.[75] Dr. Leone asked who the purchaser would be. Lopez's representatives said their client preferred to remain anonymous.[76]

During the negotiations that ensued, Dr. Leone expressed interest in retaining the right, or being licensed, to use the mark in connection with the sale of skin care products through his dermatology practice so long as "[Lopez's] use of the mark [would] be sufficiently different than [that] ... use."[77] Leone ultimately agreed to sell his rights to the GLOW KIT mark on the understanding that the purchaser would license the mark back to him for one year royalty-free,[78] and signed the assignment/license at the end of September. Lopez signed the documents in the beginning of October 2002.[79]

During the process of preparing draft assignment/license agreements, Lopez's representatives stated that "[paragraph 3.1 of the license agreement had to] include a turnover of samples of existing products which can be used as a benchmark for new products. A 'naked' license without such a standard will not pass muster."[80] Dr. Leone testified that no one contacted him on Lopez's behalf following execution of the assignment regarding the products included in the GLOW KIT, and no one inspected his records or the GLOW KIT products. Leone did not recall providing any GLOW KIT samples to Lopez.[81]

70. Pl.'s Facts, ¶ 21; Def.'s Issues, ¶ 21; Lewis Decl., ¶ 8, Ex. 5 ("Trademark Research Report"), at p. 99.

71. Pl.'s Facts, ¶ 23; Def.'s Issues, ¶ 23.

72. Pl.'s Facts, ¶ 23; Def.'s Issues, ¶ 23.

73. Pl.'s Facts, ¶ 24; Def.'s Issues, ¶ 24.

74. Pl.'s Facts, ¶ 37; Def.'s Issues, ¶ 37.

75. Pl.'s Facts, ¶ 38; Def.'s Issues, ¶ 38.

76. Pl.'s Facts, ¶ 41; Def.'s Issues, ¶ 41.

77. Pl.'s Facts, ¶ 39; Def.'s Issues, ¶ 39.

78. Pl.'s Facts, ¶ 40; Def.'s Issues, ¶ 40.

79. Pl.'s Facts, ¶ 43; Def.'s Issues, ¶ 43.

80. Pl.'s Facts, ¶ 42; Def.'s Issues, ¶ 42.

81. Leone Depo. at 39:3–9, 39:24–40:1.

After she acquired the GLOW KIT mark, Lopez filed a notice of opposition to Glow Industries' application to register the GLOW mark before the Trademark Trial and Appeal Board ("TTAB"). She then filed a motion to suspend the opposition, which Glow Industries opposed.[82] On April 9, 2003, the TTAB suspended opposition proceedings pending resolution of this action.[83]

### E. Current Use Of The GLOW KIT Mark

At his deposition on June 4, 2003, Dr. Leone testified that, because his one-year license will expire on September 25, 2003, he is in the process of "revamping" his website to "eliminat[e] the GLOW KIT and put[ ] in a new set of products."[84] Leone plans to discontinue use of the GLOW KIT mark rather than try to renew his license.[85] GLOW KIT will be replaced with the STEAL BACK TIME ® Facial Rejuvenation Kit, which will include Leone's gentle cleansing lotion and the NeoStrata Daytime Protection Cream previously included in the GLOW KIT, as well as a "green tea polyphenol" known as Replenix.[86]

According to Chip Rosen, Sweetface's Vice President of Licensing, it has been Lopez's and Sweetface's intention, since the purchase of the GLOW KIT mark in 2002, to use the mark on gift sets of GLOW BY J.Lo products. The gift sets are currently under development with Coty.[87] Certain e-mail communications from an advertising agency, Select Communications, indicate that the decision to use the GLOW KIT mark on these gift sets may have been made subsequent to Lopez's acquisition of the mark. A March 18, 2003, e-mail, for example, from Coty's marketing director, Lawrence Keller, to Select Communications included pictures of a product named "Face Kit GLOW BY J.Lo." Keller requested that Select Communications. "tell [him] where [it stood] on that, especially concerning the name . . . ."[88] The attached pictures show a clear cylinder that contains a bottle of GLOW BY J.Lo fragrance and two other products.[89] A Select Communications document dated March 19, 2003, concerning the "Glow by J.Lo Face Kit Promotion" discusses possible marketing ideas for a "Golden Glow . Face Kit," a "Luminous Light Face Kit," or a "Star Power Face Kit" containing GLOW BY J.Lo fragrance, a face bronzer, an eyeshadow and highlighter duo, and a dual color lip gloss "designed to make you glow."[90] A series of May 7, 2003, e-mails indicate that plans for a GLOW BY J.Lo kit were altered at the last minute to rename the product GLOW KIT. Sweetface's Phillip Pierce told Coty's Julie McIvor that Sweetface "would like to continue [its] plan to use the name 'GLOW KIT' on the packaging of the forthcoming color kit." McIvor responded that Coty

---

82. Pl.'s Facts, ¶ 44; Def.'s Issues, ¶ 44.

83. Pl.'s Facts, ¶ 44; Def.'s Issues, ¶ 44; Sherman Decl., ¶, Ex. 8 ("TTAB Suspension Order"). Plaintiff states that the motion to suspend is still pending. The document Lopez has submitted, however, appears to demonstrate conclusively that the TTAB has acted favorably on the request.

84. Leone Depo. at 11:4–11.

85. Leone Depo. at 37:9–23.

86. Leone Depo. at 43:22–44:17; Lay Decl., ¶¶ 4–5, Exs. 2 (TARR status sheet for STEAL BACK TIME trademark application, <tarr.usp­

to.gov>), 3 (<www.leonederm.com>, printed July 14, 2003).

87. Declaration of Chip Rosen in Support of Lopez's Opposition to Motion for Summary Judgment ("Rosen Decl."), ¶¶ 1, 3.

88. Lay Decl., ¶ 8, Ex. 5 ("Select Communications Documents") at 25.

89. Select Communications Documents at 27–28.

90. Select Communications Documents at 30–31.

would "make the last minute change to rename the GLOW BY J.LO 'Get the Glow'" colour set ... the "GLOW BY J.LO 'GLOW KIT.'" Coty's Jean Baptiste Rougeot forwarded the e-mails to Rosen with the message that the "press text concerning the 'GLOW KIT' [has been] reworked following the rename." [91] The attached press release describes a GLOW BY J.LO "GLOW KIT," which contains GLOW BY J.Lo fragrance, as well as a Glow Bronzer, Eye Glow Duo, and Glow–On Gloss.[92]

## II. DISCUSSION

### A. Legal Standard Governing Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof at trial, however, the movant can prevail merely by pointing out that there is an absence of evidence to

support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED.R.CIV.PROC. 56(e).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented by the parties must be admissible. FED.R.CIV.PROC. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir.1985); *Thornhill Pub. Co., Inc. v. GT & E Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

### B. Standing To Assert A Counterclaim Based On The GLOW KIT Mark

■ Section 32 of the Lanham Act grants standing to assert a claim for trademark infringement solely to the "registrant" of the trademark. 15 U.S.C. § 1114. This term includes both the registrant and its "legal representatives, predecessors, successors and assigns." 15 U.S.C. § 1127. See also *Berni v. International Gourmet Restaurants of America,*

---

**91.** Select Communications Documents at 32–33.

**92.** Select Communications Documents at 34. Plaintiff's counsel states that Coty has produced a number of confidential documents discussing a GLOW BY J.Lo color kit and/or face

kit, which was to contain fragrance, makeup and a bronzer. These documents reportedly bear a date of February 2003. (Lay Decl., ¶ 7). Plaintiff states that it is prepared to present these documents for *in camera* review if the court so desires.

*Inc.*, 838 F.2d 642, 645–46 (2d Cir.1988); *Ultrapure Systems, Inc. v. Ham–Let Group*, 921 F.Supp. 659, 665 (N.D.Cal. 1996). Lopez's counterclaims for trademark infringement and unfair competition assert that Glow Industries has infringed the Glow Kit mark, which was originally registered by Dr. Leone. Plaintiff seeks summary judgment on the basis that Leone's assignment of the Glow Kit mark to Lopez was not valid, and Lopez therefore has no standing to sue for infringement of the mark.

### 1. Legal Standard Governing Trademark Assignment

"There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed." *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97–98, 39 S.Ct. 48, 63 L.Ed. 141 (1918). A trademark is therefore "assignable [only] with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark." 15 U.S.C. § 1060. See also *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1289 (9th Cir.1992) (" '[T]he law is well settled that there are no rights in a trademark alone and that no rights can be transferred apart from the business with which the mark has been associated' " (citation omitted)). A "naked" or "in gross" transfer of a mark, i.e., without the associated goodwill, is invalid. See *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir.1999); *Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank*, 696 F.2d 1371, 1375 (Fed.Cir. 1982).

The term "goodwill" has been generally described as "the advantage or benefit, which is acquired by an establishment, beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patron-age and encouragement which is receives from constant or habitual customers." *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555, 113 S.Ct. 1670, 123 L.Ed.2d 288 (1993) (quoting *Metropolitan Bank v. St. Louis Dispatch Co.*, 149 U.S. 436, 13 S.Ct. 944, 37 L.Ed. 799 (1893)). See also *id.* at 572, 113 S.Ct. 1670 (Souter, J., dissenting) (citing *Cruttwell v. Lye*, 34 Eng.Rep. 129, 134 (1810) for the proposition that "goodwill is 'nothing more than the probability[ ] that the old customers will resort to the old place' "). As applied in the trademark context by Judge Platt in *Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F.Supp. 1339 (E.D.N.Y.1994), "good will is the value attributable to a going concern apart from its physical assets—the intangible worth of buyer momentum emanating from the reputation and integrity earned by the company. A trademark ... is merely the symbol by which the public recognizes that reputation and hence has no independent significance apart from the owner's good will." *Id.* at 1350.

Goodwill must accompany the assignment of a trademark "to maintain the continuity of the product or service symbolized by the mark and thereby avoid deceiving or confusing customers." *Gallo Winery, supra*, 967 F.2d at 1289 (citing 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 18:1(C)). See also *Visa, U.S.A., Inc., supra*, 696 F.2d at 1375 ("A key objective of the law of trademarks is protection of the consumer against being misled or confused as to the source of the goods or services he acquires. The rule against assignment of a mark in gross thus reflects 'the need, if consumers are not to be misled from established associations with the mark, that it continue to be associated with the same or similar products after the assignment' "); *PepsiCo, Inc. v. Grapette Co.*, 416 F.2d 285, 288 (8th Cir.1969) ("Inher-

ent to the rules involving the assignment of a trademark is the recognition of protection against consumer deception. Basic to this concept is the proposition that any assignment of a trademark and its goodwill (with or without tangibles assigned) requires the mark itself be used by the assignee on a product having substantially the same characteristics").

## 2. Evidentiary Burden For Proving An Assignment Accompanied By Goodwill

Because goodwill may be valued separately from the physical assets of a company, "[i]t is not necessary that the entire business or its tangible assets be transferred" to a trademark assignee in order to find that the assignment included goodwill. *Gallo Winery, supra,* 967 F.2d at 1289. See also *The Money Store v. Harriscorp Finance, Inc.,* 689 F.2d 666, 676 (7th Cir.1982) ("It is not necessary to the continuing validity of the mark that tangible assets of the assignor pass to the assignee"); *Dial–A–Mattress, supra,* 841 F.Supp. at 1350 ("Although courts historically have looked for a transfer of the assets embraced by the trademark to evidence the passage of good will, a transfer of assets is not essential to consummate an assignment of the name"). Conversely, a mere recitation in the assignment agreement "that the mark was assigned 'together with the good will of the business symbolized by the mark'" is not sufficient to establish a valid transfer. *Money Store, supra,* 689 F.2d at 676. See also 2 J. Thomas McCarthy, MCCARTHY ON TRADE-MARKS AND UNFAIR COMPETITION § 18:24 (4th ed. 2002) ("One can begin with a rule that most courts now accept: The mere fact that the assignment document recites that good will was transferred to the assignee does not control the validity of the assignment").

The courts instead conduct a case-by-case analysis to determine whether an assignee's use of a mark maintains sufficient continuity with the prior use. See *Dial–A–Mattress, supra,* 841 F.Supp. at 1350 ("[R]ather than looking for some formalistic passage of assets, the test is simply whether the transaction is such that the assignee can 'go on in real continuity with the past'"); *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,* 315 F.Supp. 45, 55 (S.D.N.Y.1970) ("The reason for this rule is the need, if consumers are not to be misled as a result of established associations with the mark, that the mark continue to be associated with the same or closely similar products after its assignment."); 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:24 (4th ed. 2002) ("[U]nder the modern view, the assignment should be upheld if the transaction is such that the buyer is enabled to go on in real continuity with the past, either as evidenced in the tangible or intangible assets acquired by the buyer or as evidenced by the buyer's post-transaction actions"). See also *Pepsi-Co, supra,* 416 F.2d at 289 ("A case by case treatment of the problem as specific facts present themselves is desirable").

Many courts conduct this analysis by asking whether the goods offered under the mark post-assignment are "substantially similar," to those previously associated with it, or at least "sufficiently similar to prevent customers from being misled from established associations with the mark." *Sugar Busters, supra,* 177 F.3d at 266. See, e.g., *Visa, U.S.A., Inc., supra,* 696 F.2d at 1376 ("[T]ransfer of goodwill requires only that the services be sufficiently similar to prevent consumers of the service offered under the mark from being 'misled from established associations with the mark'" (citation omitted)); *Defiance Button Machine Co., v. C & C Metal Products Corp.,* 759 F.2d 1053, 1059 (2d Cir.1985)

("[A]ssignments of marks separate from the underlying business have been upheld when the assignee 'is producing a product ... substantially similar to that of the assignor [such that] consumers would not be deceived or harmed...,'" citing *Marshak v. Green*, 746 F.2d 927, 930 (2d Cir. 1984)); *Pilates, Inc. v. Current Concepts, Inc.*, 120 F.Supp.2d 286, 310 (S.D.N.Y. 2000) (same); *Clark & Freeman Corp. v. Heartland Co., Ltd.*, 811 F.Supp. 137 (S.D.N.Y.1993) (same); *eMachines, Inc. v. Ready Access Memory*, No. EDCV00-00374–VAP (EEx), 2001 WL 456404, *11 (C.D.Cal. Mar. 5, 2001) ("Courts analyze whether or not good will accompanied assignment by determining if the assignee is producing a substantially similar product"); *Main Street Outfitters, Inc. v. Federated Dept. Stores, Inc.*, 730 F.Supp. 289, 291 (D.Minn.1989) ("Because FDS intended to have the good will associated with the trademark 'Main Street' transferred to it, and intended to obtain that property right and use it in a business that was substantially similar to that of the assignor, and did so; and because the trademark was used on goods that were 'not totally different', but were substantially similar, the test set forth in *PepsiCo* has been met").

This test has alternately been framed as "whether the assignee continues to produce goods of the same nature and quality previously associated with the mark." See *Archer Daniels Midland Co. v. Narula*, No. 99 C 6997, 2001 WL 804025, * 6–7 (N.D.Ill. July 12, 2001) ("Some courts have framed the inquiry by referring to 'two tests' that have been identified for determining whether the assignment of a mark includes the passing of good will. The first 'test' asks whether the assignee is able to go on in 'real continuity with the past' or if there is a 'continuity of management.' The second 'test examines whether [the assignee] is producing a product substantially similar to that of [the assignor]

such that consumers would not be deceived by the assignment.... [W]e prefer as more workable McCarthy's general formulation: [C]ourts will look to the reality of the transaction to see if "good will" passed.... The focus should be on protecting customers' legitimate expectation of continuity under the mark, not on searching for a "stereotyped set of formalities." ... One factor is whether the assignee continues to produce goods of the same nature and quality previously associated with the mark"); *Clark & Freeman, supra*, 811 F.Supp. 137 ("[A] trademark may be validly transferred without the simultaneous transfer of any tangible assets, as long as the recipient continues to produce goods of the same quality and nature previously associated with the mark," quoting *Defiance Button, supra*, 759 F.2d at 1059).

### 3. Whether Lopez Has Raised A Question Of Fact As To Whether The Assignment Of The GLOW KIT Mark Was Accompanied By Goodwill

It is undisputed that when Lopez's representatives first approached Leone regarding assignment of the GLOW KIT mark, they said she was interested in "acquiring marks for possible use in the cosmetic and fragrance industries." Certain evidence in the record suggests that, even before she acquired the mark, Lopez intended to use it on gift sets of GLOW BY J.LO products. Other evidence indicates this idea did not arise until the spring of this year. While there is a triable issue of fact in this regard, it is undisputed that presently, Lopez intends to use the GLOW KIT mark on gift sets containing GLOW BY J.LO fragrance and other Lopez cosmetic products.

When Lopez acquired the mark, she granted Leone a one-year license to continue his existing use. The license will

terminate in September 2003. Leone has taken steps to phase out his use of the GLOW KIT mark, and developed a substitute mark under which he will market a kit containing two of the three products found in the GLOW KIT. Leone also intends to continue separate sale of the products in the kit.

Plaintiff argues that Lopez's anticipated use of the GLOW KIT mark is not substantially similar to Leone's prior use. Lopez responds that the mark is presently being used in precisely the same manner it was before the assignment, as Leone continues to sell products under the mark pursuant to his one-year license.

### a. Whether The "License–Back" Provision Supports The Validity Of The Assignment

Numerous courts have held that assignment/license-back agreements can constitute a valid transfer of a trademark and its associated goodwill. See *Gallo Winery, supra*, 967 F.2d at 1289–90; *Visa, U.S.A., Inc., supra*, 696 F.2d at 1377; *Haymaker Sports, Inc. v. Turian*, 581 F.2d 257, 261 (Cust. & Pat.App.1978). They reason that, where "the assignor-licensee ... continue[s] to conduct the same business or provide the same services under the mark," the license-back ensures continuity of the mark, and protects customers from deception. *Visa, U.S.A., Inc., supra*, 696 F.2d at 1376. See also *Gallo Winery, supra*, 967 F.2d at 1290 ("We agree with the federal circuit that a simultaneous assignment and license-back of a mark is valid, where, as in this case, it does not disrupt continuity of the products or services associated with a given mark").

The validity of assignment/license-back transactions turns primarily on the extent to which the licensor maintains control over the quality of the goods distributed under the mark. See *Visa, U.S.A., Inc.,*

*supra*, 696 F.2d at 1377 ("The principle requirement, and the only one here critical, is that 'the licensing agreement provides for adequate control by the licensor over the quality of goods or services produced under the mark by a licensee' "); *Gallo Winery, supra*, 967 F.2d at 1290 (citing *Visa*, and noting that "[t]he district court specifically found that the settlement agreement sets out, and that the Winery is maintaining, a quality control program under which the Winery actively monitors GALLO SALAME's practices"). See also *Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East*, 542 F.2d 1053,1059 (9th Cir.1976) ("A tradename licensor must maintain control over the quality of the finished product or service to guarantee to the public that the goods or services are of the same, pre-license quality"). When the terms of a licensing agreement demonstrate that the licensor has maintained control over the quality of the goods and services, the opposing party bears the burden of demonstrating that the licensor has not exercised that control. *Visa, U.S.A., Inc., supra*, 696 F.2d at 1377 (citing, *inter alia, Edwin K. Williams & Co., supra*, 542 F.2d at 1059 ("Because a finding of insufficient control essentially works a forfeiture, a person who asserts insufficient control must meet a high burden of proof")).

Here, the license agreement grants Leone the right to use the GLOW KIT mark in connection with the manufacture and distribution of "cosmetics sold separately and as a kit, namely, alpha hydroxy acid skin creams, facial cleansing lotions, and skin creams containing vitamin A derivatives," so long as the quality of the products is at least equal in quality to the samples given Lopez upon execution of the agreement.[93] The contract contemplates that Dr. Leone will continue to use the mark in the same manner as he has previ-

---

**93.** Lewis Decl., ¶ 13, Ex. 10 (Licensing Agreement—Under Seal).

ously, and that he will maintain the quality standards evident in the samples given Lopez at signing. While Dr. Leone did not recall providing samples of GLOW KIT products to Lopez's representatives, the agreement he signed specifically states that he did.

The language of the agreement demonstrates that Lopez maintained control over the quality of the GLOW KIT products distributed by Dr. Leon pursuant to the license-back, and the burden thus shifts to Glow Industries to demonstrate that Lopez did not exercise that control. Dr. Leone's lack of recollection is not sufficient to meet that burden, and it must be assumed, for purposes of this motion, that Lopez maintained control over the quality of the products Dr. Leone distributed under the mark. Compare *Visa, U.S.A., Inc., supra*, 696 F.2d at 1377 ("The license back from Visa to Alpha Beta met that requirement. . . . Alpha Beta agreed that 'the nature and quality of all services rendered in connection with the Mark shall conform to standards set by, and under the control of [Visa].' Alpha Beta also agreed to comply with [certain] minimum standards. . . . [I]t is not determinative that there was 'no evidence showing to what extent Visa has actually exercised real and effective control. . . . The license back provided for adequate control by Visa of Alpha Beta's use of the mark") with *Haymaker Sports, supra*, 581 F.2d at 261–62 ("Here, Block and Moran . . . had no interest in the quality of shoes Avon was manufacturing, and there is no evidence that they exercised any quality control. Although quality control has been inferred in a few cases where licensing agreements were silent, there is nothing in the record before us on which to base such an inference"); *In re Impact Distributors, Inc.*, 260 B.R. 48, 55 (Bkrtcy. S.D.Fla.2001) ("[I]t is unlikely that a nonexistent entity was able to maintain the requisite 'adequate control' required for a valid license back agreement"). See also *Syntex, supra*, 315 F.Supp. at 56 ("It has been held that reliance upon the integrity of a licensee is sufficient to fulfill the control requirement where a history of trouble-free manufacture provides a basis for such reliance").

This does not address the central issue, however, which is whether a license-back provision that is limited in duration and non-exclusive, and that will expire before this matter comes to trial,[94] can provide the basis for a finding that the post-assignment use of a trademark is substantially similar to its pre-assignment use. A number of courts have found that trademark assignments were accompanied by a transfer of the goodwill associated with the trademark where the assignor was permitted to continue its prior use of the mark pursuant to a license-back provision while assignee simultaneously began concurrent use of the mark. These cases generally involve permanent license-back provisions that authorize a specific use by the assignor that does not conflict with the assignee's intended use. See *Gallo Winery, supra*, 967 F.2d at 1289–90 (winery licensed meat packager to continue to its use of the GALLO SALAME mark on meat and cheese packages); *Visa, U.S.A., Inc., supra*, 696 F.2d at 1373–74 (Visa licensed a grocery chain to continue using the CHECK O.K. mark in connection with check approval services for its customers; Visa used the mark for check approval services nationally); *Brewski Beer, Co. v. Brewski Brothers, Inc.*, 47 U.S.P.Q.2d 1281, 1998 WL 416757, * 10–11 (Trademark Tr. & App.Bd. 1998) (Los Angeles restaurant and micro-brewery licensed a New York tavern to continue operations under the mark).

In virtually all of these cases, the court has concluded that the assignment was

---

**94.** Lewis Decl., ¶ 13, Ex. 10 (Licensing Agreement—Under Seal).

accompanied by a transfer of goodwill because the products or services being offered concurrently under the mark by the assignor and assignee were substantially similar. See *Visa, U.S.A., Inc., supra,* 696 F.2d at 1376 (noting that the concurrent uses were sufficiently similar that customers would not be "misled from established associations with the mark"); *Syntex, supra,* 315 F.Supp. at 55 ("In this case the products of assignor and assignee are identical"). Cf. *Brewski Beer, supra,* 1998 WL 416757 at *11 ("[B]oth operations offer the same basic services, namely, the serving of beer and food. . . . More importantly, a customer who is familiar with Brewsky's tavern in lower Manhattan would hardly expect, should he plan to visit Brewski's restaurant and microbrewery in Hermosa Beach, that the two would be identical. In addition, if a patron of Brewsky's tavern in lower Manhattan were to travel to Los Angeles and visit Brewski's restaurant and microbrewery (brewpub) in Hermosa Beach, he or she would readily discern that there are clear differences in the two operations. It has been noted that 'some changes in the product [or service] represented by a trademark [or service mark] are expected by the public. Other changes are readily discernible. In neither case is the public deceived' ").[95] Here, although there is some question when she first formed the intention of doing so, it is undisputed that Lopez is developing a "Glow Kit" that will include various Glow by J.Lo products.

A review of the cases demonstrates that they do not support the broad holding Lopez seeks—i.e., that *any* license-back provision, even one of limited scope or duration, mandates a finding that a trademark assignment was accompanied by a transfer of goodwill. Application of such a rule would be particularly inappropriate if the assignee licensed back the trademark rights intending to use the mark at the conclusion of the limited license-back period on products or services that were not substantially similar to the prior use. The correct test is to "focus . . . on protecting customers' legitimate expectation of continuity under the mark. . . ." *Archer Daniels Midland, supra,* 2001 WL 804025 at *6–7. That focus here requires that the court look not only at the one-year period during which Dr. Leone has continued to use the Glow Kit mark, but at the upcoming period during which Lopez apparently intends to use the mark on gift sets of Glow By J.Lo products. See *Defiance Button, supra,* 759 F.2d at 1060 ("As long as the mark has significant remaining value and the owner intends to use it in connection with substantially the same business or service, the public is not deceived"); *Main Street Outfitters, supra,* 730 F.Supp. at 291 ("Because FDS intended to have the good will associated with the trademark 'Main Street' transferred to it, and intended to obtain that property right and use it in a business that was substantially similar to that of the assignor, and did so; and because the trademark was used on goods that were 'not totally different', but were substantially similar, the test set forth in *PepsiCo* has been met"). The question the court must ask, therefore, is whether Lopez's anticipated use is substantially similar to Dr. Leone's pre-assignment use.

**95.** The Ninth Circuit in *Gallo Wineries* held that the assignment/license-back was valid, despite the fact that the winery's concurrent use was distinct from the meatpacker's licensed use, because "customer's of Gallo Salame's products [had previously] mistakenly believed they were purchasing a product of the Winery. . . [such that] [t]he assignment/lease-back had the beneficial effect of bringing 'commercial reality into congruence with customer perception that [the Winery] was controlling [Gallo Salame's] use.' " *Gallo Winery, supra,* 967 F.2d at 1290.

### b. Whether Lopez's Planned Use Of The Mark Supports A Finding That The Assignment Is Valid

The undisputed evidence presently before the court indicates that Lopez's GLOW BY J.LO GLOW KITS will contain the GLOW BY J.LO fragrance and various types of cosmetics. Glow Industries maintains that such a use is not sufficiently similar to Leone's, and that the assignment is invalid as a result.

The mere fact that two uses are in the same "class" for trademark purposes is not sufficient to demonstrate that they are substantially similar. See *PepsiCo, supra,* 416 F.2d at 289 (holding that a soft drink using a "pepper" syrup was not substantially similar to a soft drink using a "cola syrup" and citing *W.T. Wagner's Sons Co. v. Orange Snap Co.,* 18 F.2d 554, 555 (5th Cir.1927) (fruit beverages are not substantially the same as ginger ale)). Indeed, even generally similar products have been found not to be substantially similar where they have key differences. Whether differences are important turns in this context on whether the products are designed to appeal to distinct or similar customer groups. Compare *Clark & Freeman, supra,* 811 F.Supp. 137 ("Sears sold only women's pixie boots under the mark "Heartland," while plaintiffs immediately applied it only to men's shoes, then later to men's hiking boots. The markets for the two goods are substantially distinct") with *Main Street, supra,* 730 F.Supp. at 290–91 (finding that "all-weather coats and women's coats" were substantially the same as "various items of clothing including jackets, rain wear and various items of apparel"); *Money Store, supra,* 689 F.2d at 678 ("United and Harriscorp offered the identical service. A customer who was drawn first to United and later to Harriscorp because of the "Money Store" mark would not be misled as to the nature of the services offered"). Cf. *Sugar Busters, supra,* 177 F.3d at 266 ("We are unconvinced by plaintiff's argument that, by stating on the cover of its diet book that it may '[h]elp treat diabetes and other diseases' and then selling some of those books on the Internet, plaintiff provides a service substantially similar to a retail store that provides diabetic supplies").

■ Lopez does not contemplate including any of the Tx Systems, NeoStrata or the Leone Dermatology Center products found in Dr. Leone's GLOW KIT in her GLOW BY J.LO GLOW KITS. Rather, the kits will apparently contain GLOW BY J.LO fragrance and other cosmetic products marketed under the Lopez name. Thus, to the extent that consumers associate the GLOW KIT mark with the Tx Systems, NeoStrata and Leone products, there will be no continuity of use. There are also substantial differences between the Tx Systems, NeoStrata and Leone products and those Lopez intends to market under the GLOW KIT name. The products included in Leone's GLOW KIT are skin lotions and cleansers designed to improve the health of the skin and protect against aging. Lopez's planned kit, on the other hand, will contain fragrance and cosmetics such as bronzer, eyeshadow and lip gloss. While, in a broad sense, both Leone's and Lopez's products are intended to make users look better,[96] they would appear, at least superficially, to appeal to different groups of consumers attempting to address different types of cosmetic challenges.

■ Neither party has proffered sufficient evidence to permit the court to reach a conclusion on the matter as a matter of

---

**96.** See Leone Depo. at 42:8–13 ("Q: Would you characterize [your GLOW KIT products] as cosmetic products? A: Well, that's hard to answer because the objective is the same is to make people look better. Cosmetics do it with maybe cover-ups and colors, and I try to do it more biologically").

law, however. First, Lopez's anticipated use is not yet finalized, and the evidence indicates that she and her marketing partners routinely make changes in product design and marketing strategy until the eve of product roll-out.[97] Second, neither party has proffered expert or other evidence regarding the market for products such as Leone's as compared with the market for the products Lopez intends to

offer under the GLOW KIT name. The record is thus devoid of evidence regarding the type of consumers who routinely purchase Lopez's cosmetics and those who purchase Leone's. Without a more fully developed record on these points, the court cannot conclude, as a matter of law, that Lopez's intended use is not substantially similar to Leone's, and that the assignment was invalid.[98] Accordingly, Glow In-

---

**97.** Plaintiff, moreover, did not present any evidence regarding Lopez's plans to use the GLOW KIT mark for fragrance and cosmetics until reply. Lopez thus had no opportunity to respond.

**98.** Plaintiff raises the additional argument that Lopez's acquisition of the mark was motivated by a desire to gain an advantage in this litigation, and not by a desire to acquire the goodwill associated with the mark. This argument ultimately amounts to a claim that the trademark assignment was a "sham transaction." Some courts have held that an assignee's apparent desire to acquire only the trademark, and not the associated goodwill, will support a finding that the assignment was invalid. See Archer Daniels Midland, supra, 2001 WL 804025 at * 7 ("ADM received no tangible assets of NII through the assignment other than the internet domain name Nutrisoy.com. ADM also admits that NII, now doing business as Mothersoy, Incorporated, continues to sell the same products ... this evidence also tends to show that good will was not transferred in connection with the NII Assignment"); Pilates, supra, 120 F.Supp.2d at 311 ("[T]here is ample evidence that Gallagher was interested in purchasing only naked trademarks rather than a business with accompanying good will. Gallagher testified candidly that he contacted Horn to find out if Horn was interest in 'selling the trademarks' and that he was negotiating to 'buy the trademarks.' He testified that he threw away eighty percent of the materials he received because 'I didn't feel I had the need to have any of that because it was not my business.' Gallagher's use of the term Pilates in his Synergy business with Steve Giordano prior to his purchase of the Pilates marks also shows that he sought only the ability to use the name Pilates rather than the good will associated with it"); Greenlon, Inc. of Cincinnati v. Greenlawn, Inc., 542 F.Supp. 890, 894

(S.D.Ohio 1982) ("[D]efendant received nothing more than the right to use plaintiff's nationally registered mark in areas of the country in which plaintiff was not already doing business.... [D]efendant received nothing of value from McCurdy other than McCurdy's permission to use the mark"). But see Carnival Brand Seafood Co. v. Carnival Brands, Inc., 187 F.3d 1307, 1309 (11th Cir.1999) (citing 2 MCCARTHY § 16:5 for the proposition that "an assignee of a trademark steps into the shoes of the assignor and that a company may 'buy[] the trademark and associated good will of a company with an early priority date in order to pre-date the priority of a rival'"); Money Store, supra, 689 F.2d at 678 (finding that the assignment of a substantially similar mark was not a "sham transaction" simply because it was motivated by a desire to obtain superior rights to the mark in the Chicago area).

The facts in this case—particularly inferences arising from the timing of Lopez's acquisition of the GLOW KIT mark, the limited duration of license-back, and Lopez's planned use of the mark on distinct products—may support a conclusion that Lopez intended only to acquire the GLOW KIT mark and not the associated goodwill. Lopez acquired rights to the GLOW KIT mark immediately following Glow Industries' initiation of this action. This supports an inference that she acquired the mark for its litigation, rather than its market, value. A trier of fact could find, moreover, that Lopez licensed the rights back to Leone for a limited term in a calculated effort to assure the validity of the trademark assignment. Finally, Lopez's plan to use the GLOW KIT mark on products that may ultimately be found to be distinct from those offered by Dr. Leone could independently suggest that she did not intend to acquire the goodwill associated with Leone's use of the

dustries' motion for summary judgment on this basis is denied.

### C. Trademark Infringement

Glow Industries argues in the alternative that Lopez's counterclaim should be dismissed because she cannot prove that Glow Industries has infringed the GLOW KIT trademark. The purpose of trademark is to aid in the "[i]dentification of the manufacturer or sponsor of a good or the provider of a service." *New Kids on the Block v. News America Publishing, Inc.*, 971 F.2d 302, 305 (9th Cir.1992). Trademarks give their owners "a limited property right in a particular word, phrase, or symbol." *Id.* at 306. In order to prevail on her trademark infringement claim, Lopez must prove (1) that she has a valid, protectable trademark and (2) that Glow Industries' use of the same or a similar mark causes a likelihood of confusion in the minds of the relevant consuming public. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir.1987); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir.1987); *Committee for Idaho's High Desert v. Yost*, 881 F.Supp. 1457, 1471 (D.Idaho 1995), modified on other grounds, 92 F.3d 814 (9th Cir.1996) (citing *Levi Strauss v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir.1985)).

### 1. Protectability

■ Under 15 U.S.C. § 1115(a), a valid federal trademark registration constitutes *prima facie* evidence that the holder owns the mark, and has the exclusive right to use the mark in commerce in connection with the goods or services specified in the registration. See *Brookfield Communications, Inc. v. West Coast Entertainment*

Corp., 174 F.3d 1036, 1046–47 (9th Cir. 1999) (in determining the likelihood of success on a motion for preliminary injunction, the court "first determine[d] whether Brookfield ha[d] a valid, protectable trademark interest in the 'MovieBuff' mark," and held that "Brookfield's registration of the mark on the Principal Register in the Patent and Trademark Office constitute[d] *prima facie* evidence of the validity of the registered mark and of Brookfield's exclusive right to use the mark on the goods and services specified in the registration"). See also *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1249 (9th Cir.1999) ("This registration constitutes *prima facie* evidence that Angha owns the marks.... It also provides constructive notice of the claimed ownership of the marks"). The presumption that arises from registration can be rebutted. See *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir.2002) ("In trademark terms, the registration is not absolute but is subject to rebuttal.... [T]he plaintiff in an infringement action with a registered mark is given the *prima facie* or presumptive advantage on the issue of validity, thus shifting the burden of production to the defendant to prove otherwise..."); *Brookfield Communications, supra*, 174 F.3d at 1047 ("Brookfield's registration of the mark on the Principal Register in the Patent and Trademark Office constitutes *prima facie* evidence of the validity of the registered mark and of Brookfield's exclusive right to use the mark on the goods and services specified in the registration.... Nevertheless, West Coast can rebut this presumption").

There is no dispute that the GLOW KIT mark is listed on the Principal Register.

mark. All of these issues regarding Lopez's are questions of fact that are not properly resolved on a motion for summary judgment. See *Chapman v. National Aeronautics and Space Admin.*, 736 F.2d 238, 242 (5th Cir.

1984) ("Intent is an issue of fact that belongs in the first instance to the [jury or] trial court"); *National Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir.1983) ("[A]mbiguity in a contract raises a question

Glow Industries asserts, however, that the registration is invalid because there is no evidence in the file wrapper that the mark was used in interstate commerce prior to registration. This challenge to the validity of the mark fails, as there is no requirement that a trademark application include evidence of sales in interstate commerce. All that is required is a statement by the applicant that the mark is "used in commerce" as that term is defined for purposes of the Lanham Act. See 37 C.F.R. §§ 2.32, 2.33 (setting forth requirements for trademark applications).

Glow Industries next asserts that Lopez has failed to adduce evidence demonstrating that products bearing the Glow Kit mark were ever sold in interstate commerce. Dr. Leone testified that he assumed Glow Kits had been sold throughout the country because "we sell our goods to many different people in different parts of the country."[99] Following Leone's deposition, plaintiff's counsel contacted Dr. Leone's attorney to request copies of shipping records demonstrating that Glow Kits were sold in interstate commerce. She made several written requests and one telephone call, but has not yet received the documents.[100] The fact that Leone has not produced shipping records in response to informal requests does not suffice to rebut the presumption of validity that attaches to the mark by virtue of its registration.[101]

Glow Industries also maintains there is a question as to the accuracy of the first use in commerce date stated on Leone's trademark application. Dr. Leone testified that the date he listed could have been the date of the first sale of a Glow Kit, the first time the Glow Kit mark was affixed to a

shopping bag, or possibly, because the application indicated that he was using the mark on his website to promote goods, the date the website was activated.[102] Plaintiff proffers no evidence regarding the dates these events occurred, and the mere fact that Dr. Leone was uncertain of the origin of the first use date does not suffice to overcome the presumption of validity that otherwise attaches to the registration. On the present record, therefore, Lopez is entitled to rely on the presumption to prove that she has valid trademark rights in the Glow Kit mark, as the triable issues of fact that remain regarding the validity of the assignment require the court to assume, for purposes of this motion proceeding, that Lopez validly obtained the rights from Leone.

## 2. Likelihood Of Confusion

 Accordingly, the court next examines whether undisputed facts in the record show that there is no likelihood of confusion between the Glow Kit and Glow marks. "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) (footnote omitted). In *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir.1979), the Ninth Circuit identified eight factors that should be considered in conducting this inquiry: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the marks' similarity in appearance, sound, and meaning; (4) evidence of actual confusion; (5) the degree

---

of intent, which is a question of fact precluding summary judgment").

**99.** Leone Depo. at 47:10–20.

**100.** Lay Decl., ¶ 9.

**101.** Plaintiff apparently has not utilized the mechanisms available under the Federal Rules of Civil Procedure to compel production of the documents she seeks.

**102.** Leone Depo., 22:17–23:2, 46:13–21,

to which the parties' marketing channels converge; (6) the type of goods and the degree of care customers are likely to exercise in purchasing them; (7) evidence of the allegedly infringing party's intention in selecting and using the name; and (8) the likelihood that the parties will expand their product lines. "The factors should not be rigidly weighed" (*Dreamwerks, supra,* 142 F.3d at 1129), but rather "are intended to guide the court in assessing the basic question of likelihood of confusion" (*E. & J. Gallo Winery, supra,* 967 F.2d at 1290). The court need not address all of the factors, nor must the claimant establish that each weighs in her favor in order to establish a likelihood of confusion. See *C & C Organization v. AGDS, Inc.,* 676 F.Supp. 204, 206 (C.D.Cal.1987) (citing *Apple Computer, Inc. v. Formula International, Inc.,* 725 F.2d 521, 526 (9th Cir. 1984)).

In *Brookfield, supra,* 174 F.3d at 1054, the court noted that the *Sleekcraft* test is "pliant," that "some factors are much more important than others, and [that] the relative importance of each individual factor will be case-specific." *Id.* It observed, however, that the similarity of the marks and whether the parties are direct competitors will "always be important." *Id.*

### (a) Strength Of The Mark

### (1) Distinctiveness

"The strength of a given mark rests on its distinctiveness." *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 1448 (9th Cir.1988). Potential trademarks fall into four categories: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Japan Telecom, Inc. v. Japan Telecom Am. Inc.,* 287 F.3d 866, 872 (9th Cir.2002); *Filipino Yellow Pages, Inc. v. Asian Journal Publs., Inc.,* 198 F.3d 1143, 1146 (9th Cir.1999). Generic terms cannot be protected as trademarks because "they are common words or phrases that 'describe a class of goods rather than an individual product,'" and thus do not relate exclusively to the trademark owner's product. *Japan Telecom, supra,* 287 F.3d at 872 (citing *New Kids on the Block, supra,* 971 F.2d at 306). Descriptive terms "suffer from the same problem." *Id.* Descriptive terms relate more directly to a particular product than do generic terms, as they "describe[ ] a person, a place or an attribute of [the] product." They will not support the grant of an exclusive property right, however, "[b]ecause they tend to consist of common words that might be the only way to describe a category of goods." *Id.* See also *Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery,* 150 F.3d 1042, 1047 n. 8 (9th Cir.1998) ("Descriptive marks define qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood").

Terms that are suggestive, or arbitrary and fanciful, by contrast, are inherently distinctive. *Japan Telecom, supra,* 287 F.3d at 872 (noting that such terms are protectable "without a showing of secondary meaning"). A suggestive mark "conveys an impression of a good but requires the exercise of some imagination and perception to reach a conclusion as to the product's nature." *Brookfield Communications, supra,* 174 F.3d at 1058 n. 19 (using "Roach Motel" insect traps as an example). See also *Kendall–Jackson Winery, supra,* 150 F.3d at 1047 n. 8 (a suggestive mark is one for which "a consumer must use imagination or any type of multistage reasoning to understand the mark's significance, [because] the mark does not *describe* the product's features, but *suggests* them" (emphasis original)). Arbitrary and fanciful marks "have no intrinsic connection to the product with which the mark is used; [arbitrary marks] consist[ ] of words commonly used in the English language [e.g. 'Black & White' scotch whis-

key], whereas [fanciful marks] are wholly made-up terms [e.g. 'Clorox' bleach]." *Brookfield Communications, supra,* 174 F.3d at 1058 n. 19 (citations omitted).

The court previously found it likely that Glow Industries would be able to prove that the GLOW mark, as used on its GLOW perfume, was suggestive because it appeared to refer to the positive feeling a consumer would obtain if she used the product. See *Giorgio Beverly Hills, Inc. v. Revlon Consumer Products Corp.,* 869 F.Supp. 176, 180 (S.D.N.Y.1994) (finding the mark RED suggestive when used for a fragrance); *Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L.,* 673 F.Supp. 1238, 1243–44 (S.D.N.Y.1987) (finding the mark PASSION suggestive when used for a fragrance); *Jean Patou, Inc. v. Jacqueline Cochran, Inc.,* 201 F.Supp. 861, 864 (S.D.N.Y.1962) (finding the mark JOY suggestive when used for a fragrance), aff'd., 312 F.2d 125 (2d Cir.1963). Although it considered the question a closer one, the court also found it likely that Glow Industries would be able to prove that the GLOW mark was suggestive as used on plaintiff's lotion and shower gel because:

> " 'GLOW' is not descriptive of the qualities or characteristics of shower gels or body lotions. Indeed, one who hears the word does not immediately think of such products. Rather, some amount of association is required to link the concept of glowing skin to use of a particular gel or lotion."[103]

Glow Industries now asserts that the court should find Lopez's GLOW KIT mark is descriptive rather than suggestive.[104] It

notes that Dr. Leone has stated in advertising and elsewhere that use of GLOW KIT products gives one's face a "subtle 'glow' " and leads to "glowing" skin.[105] Dr. Leone's testimony does not control categorization of the mark as a legal matter. Indeed, his advertising statements are not unlike Glow Industries' own descriptive play on words, choosing such product names as "Wash and GLOW" for shower gel and "Body GLOW" for body lotion. Based on the evidence presently in the record, the court concludes that, like GLOW, the GLOW KIT mark is also suggestive because some amount of imagination is required to make a connection between use of the kit's contents and glowing skin. See *Standard International Corp. v. American Sponge and Chamois Co., Inc.,* 55 C.C.P.A. 1155, 394 F.2d 599, 600 (Cust. & Pat.App.1968) (concluding the "Glow," as used in DUST'N GLOW, was "suggestive of the effect of using a wax polish upon furniture"); *Sears Roebuck & Co. v. Haymer,* 46 C.C.P.A. 783, 263 F.2d 348, 349 (Cust. & Pat.App. 1959) (noting, with respect to the competing marks GLO-RAY and GLOW for hairdressing products that, "while the hyphenation of appellee's mark sets 'GLO' apart and probably gives a suggestion of glowing, . . . the primary impression created by the mark as a whole is that of glory, or a shining ray. Moreover, the word 'GLOW' as associated with preparations designed to be applied to the hair does not appear to be arbitrary, but rather *suggests* that a desirable result will be obtained when used" (emphasis added)). See also *Jean Patou, supra,* 201 F.Supp. at 865 ("The

---

**103.** Preliminary Injunction Order at 24:8–11.

**104.** Plaintiff does not concede, by making this argument, that its use of the GLOW mark is descriptive. Rather, it notes that Glow Industries' marketing strategy is distinct from Dr. Leone's, and focuses on brand cohesiveness rather than the descriptive nature of the mark.

**105.** Similarly, advertising materials developed in connection with the planned launch of GLOW BY J.LO GLOW KITS state that the cosmetics and fragrance included are "designed to make you glow." (Select Communications Documents at 30–31).

defendant's use of the word 'joy' in JOY OF BATHING ... is used to evoke a certain emotion on the part of the prospective purchaser. The use of the phrase JOY OF BATHING is designed to suggest the pleasure which will accompany the use of defendant's product in one's bath").

Given that the mark is suggestive, Lopez cannot claim broad protection for it, and should have anticipated some confusion with legitimate competitors as a consequence. *Dreamwerks, supra*, 142 F.3d at 1130 ("Had Dreamwerks chosen a descriptive mark like Sci–Fi Conventions Inc., or a suggestive mark like Sci–Fi World, some confusion with the marks of legitimate competitors might be expected"). See also *Brookfield Communications, supra*, 174 F.3d at 1058 ("We have recognized that, unlike arbitrary or fanciful marks which are typically strong, suggestive marks are presumptively weak").

### (2) Commercial Strength

■ " 'Placement on the spectrum of distinctiveness does not end the enquiry as to the strength of a mark: it is only the first step. The second step is to determine the strength of th[e] mark in the marketplace. That is, its degree of recognition in the minds of the relevant customer class.' " *Miss World, supra*, 856 F.2d at 1449 (quoting 1 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 11:1 (2d ed.1984)). See also *Petro Stopping Centers v. James River Petroleum, Inc.*, 130 F.3d 88, 93 (4th Cir. 1997) (" ... the placement of a mark in either the suggestive or descriptive category is merely the first step in assessing the strength of a mark for purposes of likelihood of confusion test.... [C]ourts must examine, in addition to the mark's characterization as suggestive or descriptive, the extent of secondary meaning a mark has

acquired in the eyes of consumers"); *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir.1983) (the distinctiveness of the mark and the extent of third-party use "both ... should be considered when analyzing the strength of a particular trademark"); *Sun Banks of Florida, Inc. v. Sun Federal Savings & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981) (after holding that plaintiff's mark was arbitrary, the court stated: "The ultimate strength of a mark, [however,] the key inquiry before us, is determined by a number of factors which establish its standing in the marketplace"); 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 11.83 (4th ed. 2002) ("While some courts have made the strong-weak evaluation solely upon the place of a term on the spectrum of marks, such an approach is incomplete. One must in addition look at the marketplace strength of the mark at the time of the litigation or at the time registration is sought").

Neither party has offered evidence regarding the extent to which the GLOW KIT mark enjoys market recognition. Such evidence as there is suggests that market recognition is weak, however. It is undisputed that Dr. Leone sold fewer than 170 GLOW KITs in the twenty-two months between November 2000 and September 2002, and that his sales totaled only $11,000. It is also undisputed that a majority of the sales were to patients of Dr. Leone's dermatology practice, which operates at two locations in Illinois. Indeed, sales records Leone gave Lopez in anticipation of his assignment of the mark indicate that he may have sold only 22 GLOW KITs between November 2000 and September 2002 via his website.[106] Leone testi-

---

106. Lewis Decl., Ex. 11 (Affidavit of Giulio Leone—Under Seal); Leone Depo. at 24:19– 25:4.

**1120**

fied that the patients who visit his office live primarily in the Chicago area and elsewhere in Illinois.[107] He was not aware that GLOW KITS or GLOW KIT products had been featured in any print publications, on the radio, or on television.[108]

The fact that the GLOW KIT mark is only suggestive, and its undisputedly limited commercial strength, demonstrate that the mark is weak. Cf. 2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 11.83, p. 11–143 (4th ed. 2002) ("'A mark can be conceptually strong (by being arbitrary or fanciful) and at the same time be commercially weak if the mark lacks significance in the marketplace for identifying the origin of the goods,'" quoting *Oxford Industries, Inc. v. JBJ Fabrics, Inc.*, 6 U.S.P.Q.2d 1756 (S.D.N.Y. 1988)). Thus, this *Sleekcraft* factor favors a finding that there is no likelihood of confusion.

### (b) Proximity Or Relatedness Of The Parties' Goods

■ "Related goods are those 'products which would be reasonably thought by the buying public to come from the same source if sold under the same mark.'" *Sleekcraft, supra,* 599 F.2d at 348, n. 10 (quoting *Standard Brands, Inc. v. Smidler,* 151 F.2d 34, 37 (2d Cir.1945)); *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 159 (9th Cir. 1963) ("The use need not be the same as, nor one in competition with the original use. The question is, are the uses related so that they are likely to be connected in the mind of a prospective purchaser?"). See also *Brookfield Communications, supra,* 174 F.3d at 1056 (holding that because "both companies offer products and services relating to the entertainment industry generally, and their principal lines of business both relate to movies specifically," there was sufficient relatedness of goods to support a finding of likelihood of confusion); 4 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 24.24 (4th ed. 2002) ("Goods are 'related' if consumers are likely to mistakenly think that the infringer's goods come from the same source as the senior user's goods or are sponsored or approved by the senior user").

Glow Industries' GLOW products are "bath and body products" designed for use in the bath and on customers' skin. They include perfume, skin lotion and body wash, as well as an oil with antioxidant properties designed to repel "free radicals," and a hydrosol mist that reputedly offers skin benefits. Both fragrance and "the sanctity of the bathing ritual" are important focuses in the development of GLOW products.

The products included in the GLOW KIT are also designed for use on a customer's skin. They include an alpha-hydroxy acid cream, a facial cleansing lotion and a skin cream containing Vitamin A derivatives. The vitamin A derivatives "help fight wrinkles, ... help unblock pores, [and] ... turn the skin over a little more quickly."[109] In developing the combination of products marketed as the GLOW KIT, Dr. Leone stated that

"I would tell patients, you need a sunscreen moisturizer in the morning, and you need something for the fine wrinkles at night, and something gentle to wash with. I said wait a minute, let[']s put it together and call it something. I said it makes your skin glow. That's how the Glow Kit came about."[110]

---

**107.** Leone Depo. at 30:1–11.

**108.** Leone Depo. at 43:17–21.

**109.** Leone Depo. at 22:11–16.

**110.** Leone Depo. at 13:11–17.

Dr. Leone described the products in the GLOW KIT as "cosmeceutical" or "cosmeticky" products: products that are "almost like medication" but designed to make people look better.[111] He does not believe the products have any fragrance.[112] When asked to compare his GLOW KIT products to the products offered by Glow Industries, Leone observed that his products "are for anti-aging," while Glow Industries' products "are more for cosmetics, feel good lotions, soaps, fragrant products."[113] Glow Industries emphasizes the quasi-medical nature of the GLOW KIT products, and notes specifically that two were produced and marketed by dermatological companies.[114] Leone said, however, that he might also classify GLOW products as dermatological since, "in a broad sense, they relate to the skin."[115] As Lopez notes, moreover, some mass-marketed skin products have trade names that suggest development or endorsement by physicians as well as anti-aging properties. These include a skin conditioning tonic marketed under the name "Prescriptives," a moisturizing lotion marketed under the name "Physicians Formula," a vitamin A cream marketed under the name "Dr.," an enhancing lotion by Olay named "Regenerist," and a moisturizing lotion whose label bears the phrase "Dermatologist Recommended."[116]

The mere fact that "two products or services fall within the same general field ... does not mean that the[y] ... are sufficiently similar to create a likelihood of confusion." *Harlem Wizards Entertainment Basketball, Inc. v. NBA Properties,*

*Inc.,* 952 F.Supp. 1084, 1095 (D.N.J.1997). In *Sunenblick v. Harrell,* 895 F.Supp. 616 (S.D.N.Y.1995), aff'd., 101 F.3d 684 (2d Cir.1996), for example, the court found that plaintiff's and defendant's use of the UPTOWN RECORDS mark for music recordings did not create a likelihood of confusion because "[plaintiff]'s products [were] addressed to a somewhat esoteric market, viz., purchasers interested in lost or forgotten jazz artists, in the 'straight ahead jazz' category, whereas defendants sell rap recordings," and because the distinct recordings were "featured in different sections of the stores ... according to genre and not by label name." *Id.* at 629. See also *Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.,* 269 F.3d 270, 287 (3d Cir.2001) ("Goods may fall under the same general product category but operate in distinct niches. When two products are part of distinct sectors of a broad product category, they can be sufficiently unrelated that consumers are not likely to assume the products originate from the same mark"); *Harlem Wizards Entertainment Basketball, supra,* 952 F.Supp. at 1095 ("The show basketball performed by plaintiff is markedly distinct from NBA competitive basketball in myriad ways. As a show basketball team, plaintiff simply does not play NBA level competitive basketball.... Therefore, the court finds that when every aspect of the two teams is compared, there is glaring dissimilarity").

It is also true, however, that " '[c]omplementary products or services are particu-

111. Leone Depo. at 14:22–15:11.

112. Leone Depo. at 43:14–16.

113. Leone Depo. at 41:17–20.

114. Glow Industries also notes that the NeoStrata website states its products are sold only to dermatologists and plastic surgeons. While this may be true, Dr. Leone's purchase

and resale of the products to non-physicians without a prescription undercuts the significance of the manufacturer's statements.

115. Leone Depo. at 42:5–22.

116. Declaration of Christine Susky in Support of Lopez's Opposition to Motion for Summary Judgment ("Susky Decl."), ¶¶ 3–7, Exs. 1–5

larly vulnerable to confusion.'" *Sleek-craft, supra,* 599 F.2d at 350 (quoting *Communications Satellite Corp. v. Comcet, Inc.,* 429 F.2d 1245, 1253 (4th Cir. 1970)). See also *Brookfield Communications, supra,* 174 F.3d at 1055 ("Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods"). Here, triable issues of fact remain as to whether consumers might conclude that Dr. Leone had expanded his anti-aging skin care regimen to include the more commercial, fragrant skin care products sold by Glow Industries. See *Cohn, supra,* 281 F.3d at 841 (holding that the parties' goods and services were related, as plaintiff "provides veterinary services and makes ancillary sales of pet supplies, while Petsmart sells pet supplies and offers ancillary veterinary services through Dr. Barton"). Accordingly, the court cannot properly weigh this factor at the present time.

### (c) Similarity Of The Marks

■ "Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft, supra,* 599 F.2d at 351. In judging similarity, trademarks should be considered as they are encountered in the marketplace, taking into account the normal circumstances surrounding purchase of the type of goods they represent. *Id.; Lindy Pen Co. v. Bic Pen Corp.,* 725 F.2d 1240, 1245 (9th Cir.1984), cert. denied, 469 U.S. 1188, 105 S.Ct. 955, 83 L.Ed.2d 962 (1985); *Walt Disney Productions v. Air Pirates,* 581 F.2d 751, 759 (9th Cir.1978).

The use of the word "glow" in both marks, suggesting as it does the positive effects of the associated skin care products, demonstrates some similarity of sound and meaning. The marks must nevertheless be compared in their entirety, rather than in dissected form. See 3 J. Thomas McCarthy, MCCARTHY ON TRADE-MARKS AND UNFAIR COMPETITION, § 23.43

(4th ed.2002); *Official Airline Guides, Inc. v. Goss,* 6 F.3d 1385, 1392 (9th Cir.1993) ("The marks must be considered in their entirety and as they appear in the marketplace"); *A & H Sportswear Co. Inc. v. Victoria's Secret Stores, Inc.* 167 F.Supp.2d 770, 780 (E.D.Pa.2001) (same). This requires that the court look beyond the fact that both marks include the word "glow," and consider whether the phrase "glow kit" is similar to the single word "glow." Once that comparison is made, the court may, if appropriate, assess individual features of the marks, provided its ultimate conclusion rests on their similarity in totality. See, e.g., *Packard Press, Inc. v. Hewlett–Packard Co.,* 227 F.3d 1352, 1357–58 (Fed.Cir.2000) ("The similarity or dissimilarity of the marks in their entirety is to be considered with respect to appearance, sound, and connotation.... All relevant facts pertaining to appearance, sound, and connotation must be considered before similarity as to one or more of those factors may be sufficient to support a finding that the marks are similar or dissimilar.... Once all of the features of the mark are considered, however, it is not improper to state that, for rational reasons, more or less weight has been given to a particular feature of the mark, provided the ultimate conclusion rests on consideration of the marks in their entireties.... We agree with Packard that the Board improperly dissected the marks. In this case, the Board only considered the similar commercial impression of part of the marks—the shared word PACKARD—before concluding that the marks were similar.... However, the Board failed to make any findings at all as to the appearance or sound of the marks, and without any explanation, considered only the PACK-ARD portion of HEWLETT-PACKARD.... Moreover, although the Board correctly noted that it is proper to give greater weight to the PACKARD portion of the PACK-

ARD TECHNOLOGIES mark on the ground that the word 'technology' is highly suggestive/merely descriptive with respect to the services at issue, ... it completely failed to consider the appearance and sound of the mark as a whole. Although it is proper to indicate that more weight is given to a particular component of the mark—the meaning of PACKARD in this case—that does not excuse consideration of the other components of the mark as a whole"); *In re National Data Corp.*, 753 F.2d 1056, 1058–59 (Fed.Cir.1985) ("It follows from that principle that likelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark. On the other hand, in articulating reasons for reaching a conclusion on the issue of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. That a particular feature is descriptive or generic with respect to the involved goods or services is one commonly accepted rationale for giving less weight to a portion of a mark.... Without question, the descriptive or generic character of an expression which forms part of both marks under consideration is pertinent to the issue of likelihood of confusion"). See also *Burger Chef Systems, Inc. v. Sandwich Chef, Inc.*, 608 F.2d 875, 878 (Cust. & Pat.App.1979) ("although the involved marks must be regarded in their entireties, it is proper to recognize that one feature of a mark is more significant than the other features and to give greater force and effect to that dominant feature"). but see *Luigino", Inc. v. Stouffer Corp.*, 170 F.3d 827, 830 (8th Cir.1999) ("The use of identical dominant words does not automatically mean that two marks are similar.... We must look to the overall impression created by the marks, not merely compare individual features").

Here, the addition of "kit" to "glow" changes both the sight and sound of the marks. "Kit," however, is a completely generic or descriptive term, which advises the consumer that multiple products have been grouped together for sale. Accordingly, the dominant element of both marks is the word "glow." When this fact is considered, and the descriptive nature of "kit" is taken into account, the similarity of the marks is apparent. *Induct–O–Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 363–64 (6th Cir.1984) ("In the instant case, 'o' is a descriptive vowel common to 'INDUCTO' and 'INDUCT-O–MATIC' and must therefore be deleted. ... Thus, only the term 'matic' distinguishes the two marks. 'Matic' is clearly a descriptive phrase, and, as found by the district court, indicates automation. As such, it also requires deletion. Accordingly, ... there is no 'identifying character to the trade designations' of 'INDUCTO' and 'INDUCT-O–MATIC' other than the suggestive term common to both, 'induct,' that makes it unlikely that one trademark will be mistaken for another").

As they appear on the parties' products, however, the marks are visually distinct. The GLOW products sold by Glow Industries have white labels, with the mark printed in a simple typeface at the top of each label. The GLOW KIT mark does not appear on any of the individual products included in the set. Rather, it is found on a shiny, metallic sticker on the shopping bag in which the products are placed. At the top of the sticker is the name "Leone Dermatology Center"; below this are a series of phone numbers, addresses and Leone's website address. The mark appears at the bottom of the sticker, in a bordered box that states "GLOW KIT for Non–Sensitive [or Sensitive] Skin."

"Different packaging, coloring, and labeling can be significant factors in determining whether there is a likelihood of

confusion." *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 644 (7th Cir.2001). See also *Nabisco, Inc. v. Warner–Lambert Co.*, 220 F.3d 43, 47 (2d Cir.2000) ("Our inquiry does not end with a comparison of the marks themselves. Rather, in determining whether two marks are confusingly similar, we must 'appraise the overall impression created by ... the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers'"); *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 744 (2d Cir.1998) ("In determining whether the two marks are similar, and therefore likely to provoke confusion among prospective purchasers, courts appraise 'the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers,'" quoting *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir.1993)); *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir.1998) ("Even if the trade names are similar, the likelihood of confusion is reduced if the two trademarks, taken as a whole, are visually distinct").

The packaging of GLOW and GLOW KIT products is markedly different, and tends to minimize any confusion generated by the similarity of the trademarks. The court accordingly finds that, at least as used by Dr. Leone, there are no triable issues of fact with respect to the similarity of the marks. See *Nabisco, supra*, 220 F.3d at 47–48 (holding that the presentation of competing marks "in starkly different typefaces and styles," as well as differences in the shape, dimensions and color patterns of product packages gave rise to "distinctly different commercial impressions" and negated any likelihood of consumer confusion); *Luigino's, supra*, 170 F.3d at 831 (considering, *inter alia*, the fact that "[t]he trade dress of the two [parties'] packages [was] ... visually dis-

tinct," with "different colors and typefaces," in concluding that MICHELINA'S LEAN 'N TASTY was not confusingly similar to STOUFFER's LEAN CUISINE as a matter of law); *Estee Lauder, Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1512 (2d Cir.1997) (citing, *inter alia*, "the facts that the rendering of '100%' in the two sets of marks is different in appearance [and] that the appearance of the packaging overall is quite different in graphic design," in holding that there was no likelihood of consumer confusion as a matter of law); *Lang v. Retirement Living Publishing Co.*, 949 F.2d 576, 581–82 (2d Cir.1991) ("Both designations include as their focal point the words 'New Choices.' However, Lang's name always includes the word 'Press,' whereas Retirement Living's mark always includes the words 'For The Best Years.' The typeface also serves to distinguish the two designations, as does the location of the designations on the products.... As such, the general impression conveyed to the public by these designations differs significantly, and therefore we agree with the district court that the similarities do not create an issue of fact on the likelihood of consumer confusion"). This *Sleekcraft* factor therefore favors a finding that there is no likelihood of customer confusion.

**(d) Evidence Of Actual Confusion**

Evidence of actual confusion is not necessary to prevail on an infringement claim. See *Academy of Motion Picture Arts & Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir.1991) ("actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act"); *Levi Strauss, supra*, 778 F.2d at 1360 ("The absence of evidence of actual confusion need not give rise to an inference of no likelihood of confusion"). Proof of actual confusion, however, "is persuasive proof that future confusion is likely." *Sleekcraft, supra*, 599 F.2d at 352. See also *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1218 (9th Cir.1987)

("Evidence of actual confusion is strong evidence of likelihood of confusion, but it is not determinative"); *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir.1971) ("[t]here can be no more positive or substantial proof of the likelihood of confusion than proof of actual confusion. Moreover, reason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof"); *Dominion Bankshares Corp. v. Devon Holding Co., Inc.,* 690 F.Supp. 338, 347 (E.D.Pa.1988) ("[a]ctual confusion is one of the most reliable indications of the likelihood of confusion"); *Jockey Int'l, Inc. v. Burkard,* 185 U.S.P.Q. 201, 207 (S.D.Cal.1975) ("[s]ince reliable evidence of actual confusion is difficult to obtain in trademark infringement cases, any such evidence is substantial evidence that confusion is likely").

At least three types of evidence are probative of confusion: (1) evidence of actual instances of confusion; (2) survey evidence; and (3) inferences arising from judicial comparison of the conflicting marks and the context of their use in the marketplace. *Cairns v. Franklin Mint Co.,* 24 F.Supp.2d 1013, 1040 (C.D.Cal.1998) (quoting *Dr. Seuss Enterprises, L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394, 1404 (9th Cir.1997)). Here, it is undisputed that there have been no instances of actual confusion. Accordingly, the court finds that this factor favors a finding that there is no likelihood of customer confusion.[117]

**(e) The Degree To Which The Marketing Channels Converge And The Likelihood That The Product Lines Will Expand**

■ The marketing channels factor requires that the court consider whether the predominant purchasers of the parties' goods are similar or different, and whether the marketing approaches used resemble each other. See *Gray v. Meijer, Inc.,* 295 F.3d 641, 649 (6th Cir.2002). See also *Frehling Enterprises, Inc. v. International Select Group, Inc.,* 192 F.3d 1330, 1339 (11th Cir.1999) (" 'Dissimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception.' ... This factor takes into consideration where, how, and to whom the parties' products are sold," quoting *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 262 (5th Cir.), cert. denied, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980)). Direct competition between the parties' products is not required for this factor to weigh in favor of a likelihood of confusion. Similarly, the parties' outlets and customer bases need not be identical; only some degree of overlap need be present before the factor favors a finding of likelihood of confusion. *Frehling Enterprises, supra,* 192 F.3d at 1339. See also *Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 877 (Fed.Cir.1992) ("An opposer need not establish the sale of both parties' services by the same vendor to show employment of the same trade channels.... Rather, this factor covers 'similarity and dissimilarity of established, likely-to-continue trade channels.' ... This court does not limit channels of trade to identical stores or agents. Rather a channel of trade includes the same type of distribution channel. For example, this court has held channels of trade identical when products were sold under opposing marks in supermarkets and grocery stores across the country.... An opposer does not have the burden to show sales of an infringing prod-

117. As Lopez notes, both GLOW and GLOW KIT have a relatively small commercial presence in Illinois (and elsewhere). This makes in-stances of actual confusion unlikely. The court accordingly gives only minimal weight to this factor.

uct by a specific chain of supermarkets or agents").

Both GLOW products and Dr. Leone's GLOW KITS are available over the Internet. Beyond this, however, the marketing channels are almost entirely distinct. While GLOW products are available in department stores, specialty boutiques, and hotel gift shops, GLOW KITS can be purchased only or at Dr. Leone's dermatology offices. There also appears to be no overlap in the advertising media used. GLOW products have been featured in magazines, on television shows, in movie credits, and through promotional ventures; Dr. Leone is unaware that GLOW KITS have been mentioned in any of these media. Thus, the only similarity in sales outlets and advertising is the fact that both Glow Industries and Dr. Leone operate a "virtual storefront" on the Internet.

Parties' "simultaneous use of the Web as a marketing and advertising tool" may support a finding that there is an overlap of marketing channels. *Brookfield Communications, supra,* 174 F.3d at 1057. As the *Brookfield* court noted, "[i]n the Internet context, in particular, entering a web site takes little effort—usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership." *Id.*

Nonetheless, where products are dissimilar or the websites on which they are offered are different in orientation, this weighs against a finding that marketing channels are similar. Compare *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1207 (9th Cir.2000) ("[T]he Web, as a marketing channel, is particularly susceptible to a likelihood of confusion since, as it did in this case, it allows for competing marks to be encountered at the same time, on the same screen. In determining whether there is a likelihood of confusion, we rely heavily on the fact that the marks are similar, that Disney and GoTo offer very similar services, and that they both use the web as their marketing channel") with *Therma-Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 640 (6th Cir.2002) ("[B]ecause TSI and Thermoscan have predominately different customers and because their use of the Internet is insufficient to establish common marketing approaches, a consideration of the marketing channels actually used also supports a finding that confusion is not likely to occur"). Cf. *Bally Total Fitness Holding Corp. v. Faber,* 29 F.Supp.2d 1161, 1163–64 (C.D.Cal.1998) ("The fact that the parties both advertise their respective services on the Internet may be a factor tending to show confusion, but it does not make the goods related.... The Court finds that Faber's site does not compete with Bally's site. It is true that both sites provide Internet users with the same service—information about Bally. These sites, however, have fundamentally different purposes. Bally's site is a commercial advertisement. Faber's site is a consumer commentary. Having such different purposes demonstrates that these sites are not proximately competitive").

In this case, the parties' respective Internet sales locations have distinctly different orientations. GLOW products are marketed on national cosmetics websites that offer customers access to a variety of beauty products. They are also marketed on Glow Industries' own website. GLOW KITS are offered for sale only on Dr. Leone's website, which is directly connected to his dermatology practice. Glow Industries' "Glowspot.com" resembles its product catalogue, in that it sets forth the company's mission statement, a list of physical locations where GLOW products may be purchased, and information about various products. The site allows customers opportunities to view recent publica-

tions featuring GLOW products, enter personal information in order to receive the company's newsletter, and purchase GLOW products.[118] Leone's "Leonederm.com," by contrast, describes his dermatology practice, the staff at his dermatology offices, treatment options and available procedures for patients. It also allows visitors to access the "LDS Skin Care Shop," which offers dermatological products for sale under the headings cosmetic/anti-aging, skin disorders and seniors' skin problems. The "GLOW KIT® for Sensitive Skin" is among the products listed under the "cosmetic and anti-aging product[ ]" heading.[119]

Leonederm.com's focus on dermatology and anti-aging products is clearly distinct from Glowspot.com's focus on the bathing ritual and the commercial availability of GLOW products. Based on the undisputed facts in the record, the court concludes that the fact both products are offered for sale on the Internet does not create a danger of confusion among the Web-surfing public, and thus that the marketing channels used for the products are not similar. *Therma–Scan, Inc. v. Thermoscan, Inc.,* 118 F.Supp.2d 792, 802–03 (E.D.Mich.2000) ("While the defendant's ear thermometers are marketed to both health care professionals and to the general public, patients avail themselves of TSI's highly specialized medical examination services almost exclusively upon referral from one type of health care professional: a physician.... Plaintiff TSI largely, although not exclusively, directs its promotional activities to physicians and other health care professionals with the hope that they will refer patients to the plaintiff for thermal imaging diagnostics.... The Court is persuaded that, because the services offered by TSI are readily distinguished from the product sold by Ther-

moscan, the fact that both parties utilize the Internet as a marketing channel does not militate in favor of finding a likelihood of confusion between the two. Instead, failure of either party to utilize the Internet for promotion and advertising would seem remarkable, given the increasing number of consumers who utilize the Web as an information and research tool"), aff'd., 295 F.3d 623 (6th Cir.2002). This *Sleekcraft* factor thus weighs in favor of a finding that there is no likelihood of confusion.

Dr. Leone does not intend to expand his use of the GLOW KIT mark. Indeed, as his license is terminating, he is presently phasing out the mark on his products. Lopez apparently intends to use the mark in the future to sell gift sets of her GLOW BY J.LO products. This raises a question of fact as to whether, once the new use is undertaken, the marketing channels will converge, and create a likelihood of consumer confusion.

### (f) Degree Of Care Exercised By Consumers

Courts have recognized that purchasers of skin care products tend to exercise a high degree of care and brand consciousness. See *Clinique Laboratories, Inc. v. Dep Corp.,* 945 F.Supp. 547, 556 (S.D.N.Y.1996) ("The evidence shows that most consumers of skin care products are women (and the products at issue are marketed to women), who take care in deciding what products to use on their skin, particularly the skin on their faces. While Clinique's products are not extravagantly priced, they are sold in high quality department stores. Under these circumstances, sophistication of consumers usually militates against a finding of likelihood of confusion"); *P.F. Cosmetique SA v. Minnetonka, Inc.,* 605 F.Supp. 662, 671

---

**118.** Williams Decl., Ex. 5 (Glowspot.com).

**119.** Lewis Decl., Ex. 14 (Leonederm.com).

(S.D.N.Y.1985) (concluding that purchasers of top-of-the-line beauty products in roughly similar product packaging often distinguish between products that share a number of common elements); *Jean Patou, supra*, 201 F.Supp. at 866 ("The women who buy plaintiff's and defendant's products are apt to make an individual choice. There is a vast array of cosmetics on the market varying greatly in price and in the claims made by their producers. The products are not all alike; their potential customers realize this, and tend to be selective"). Neither party disputes the sophistication of the relevant purchasing class. This factor accordingly supports a finding that there is no likelihood of confusion.

### (g) Glow Industries' Intent In Adopting The Mark

Knowing adoption of a mark closely similar to another is a basis for inferring an intent to deceive. See, e.g., *Official Airline Guides, supra*, 6 F.3d at 1394 ("[w]hen an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public"). See also *Daddy's Junky Music Stores, Inc., v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 286 (6th Cir.1997) ("the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying"); 3 J. Thomas McCarthy, TRADEMARKS AND UNFAIR COMPETITION, § 23:115 (4th ed.2002) ("[i]f a well-known and strong mark has been used in identical format by a junior user, it appears reasonable to require the junior user to carry the burden of explanation and persuasion as to his motive in adopting the mark").

Lopez asserts there is at least a question of fact as to Glow Industries' good faith adoption of the GLOW mark. She

notes there is evidence that a trademark search report conducted by its attorney several weeks prior to the filing of Glow Industries' trademark application revealed the GLOW KIT mark, and that Glow Industries' Williamson denied in her deposition that she was aware of the GLOW KIT mark prior to the commencement of this litigation.[120] Lopez also notes that Williamson denied knowing that the Patent and Trademark Office had raised a question about the similarity of the GLOW and GLOW KIT marks prior to the institution of this action.[121] This evidence does not demonstrate that Williamson knew of the GLOW KIT mark prior to the time Glow Industries began using the GLOW mark in February 1999. At best, it indicates that she learned of the GLOW KIT shortly thereafter in April 1999, when Glow Industries filed its trademark application. There is, moreover, no evidence that Glow Industries' attorney communicated the findings of the trademark report to Williamson, and thus no concrete proof that she was aware of the GLOW KIT mark even at that point. At a minimum, these gaps create triable issues of fact regarding her knowledge, which mount when one considers the number of cosmetics and skin care companies that use some form of "glow" in their trademark or trade name. Accordingly, the court cannot properly weigh this factor on the present record.

### 3. Evaluation Of The Factors

■ Based on the undisputed factual record, the court cannot conclude as a matter of law that there is no likelihood of consumer confusion between the GLOW and GLOW KIT marks. The Ninth Circuit has cautioned district courts not to apply the *Sleekcraft* factors mechanistically. See *Entrepreneur Media, Inc. v. Smith*, 279

---

**120.** Sherman Decl., ¶ 6 (Trademark Search Report); Williamson Depo. at 29:23–25.

**121.** Williamson Depo. at 29:14–19.

F.3d 1135, 1141 (9th Cir.2002) ("The *Sleek-craft* factors are ... a 'guide' to decision-making, intended to channel the analytical process but not dictate any result.... Since each factor represents only a facet of the single dispositive issue of likely confusion, the factors, not surprisingly, tend to overlap and interact, and the resolution of one factor will likely influence the outcome and relative importance of other factors.... Thus, we do not decide whether confusion is likely by considering mechanically the number of *Sleekcraft* factors that weigh in favor of either party, or by giving the same weight to a particular factor from case to case.... To do so would be entirely misleading, as the determination of one factor is often, in essence, only another way of viewing the same considerations already taken into account in finding the presence or absence of another one. Rather, as we apply the *Sleekcraft* test, we consider what each factor, and—more importantly—what the analysis as a whole, reveals about the ultimate question before us: the likelihood of consumer confusion as to the origin of the product or service bearing the allegedly infringing mark").

A review of the *Sleekcraft* factors in this case reveals there are triable issues of fact regarding the similarity of the products, and Lopez's intended use of the GLOW KIT mark on her GLOW BY J.LO product line. For purposes of assessing likelihood of consumer confusion, the court has analyzed this future possibility as a planned "expansion" of use of the mark, although, strictly speaking, it may constitute a different use altogether. Lopez's intended use may significantly alter analysis of certain of the factors that presently favor a finding there is no likelihood of confusion. For example, the commercial impression of the GLOW KIT mark may change markedly once Lopez begins using it on her products. There may be incidences of actual confusion as well, since Lopez's products are more similar to Glow Industries' than

Dr. Leone's. The similarity in marketing channels will increase as well. Since the court has considered Lopez's planned use in concluding that triable issues of fact remain regarding the validity of the assignment by Leone, it is appropriate that it likewise be considered in assessing likelihood of confusion. Overall, therefore, the possibility that Lopez's use of the mark will differ substantially from Dr. Leone's precludes resolution of the claim on summary judgment at this time. As the Ninth Circuit has warned, "district courts should grant summary judgment motions regarding the likelihood of confusion sparingly, as careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record." *Clicks Billiards Inc. v. Sixshooters Inc.,* 251 F.3d 1252, 1265 (9th Cir.2001). See also *Entrepreneur Media, supra,* 279 F.3d at 1140 (" 'Because of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena' "). Here, the single most pertinent factor is Lopez's planned use of the mark, which the evidence reflects may commence in a matter of months. Additionally, one of the most important factors in assessing the likelihood of confusion between Glow Industries' and Dr. Leone's products cannot be decided on this record—i.e., the similarity of the products. Accordingly, the court concludes that Glow Industries is not entitled to the entry of judgment in its favor on the trademark infringement counterclaim at this time.

## III. CONCLUSION

For the foregoing reasons, Glow Industries' motion for partial summary judgment is denied.